[No. H032502. Sixth Dist. Aug. 20, 2009.]

CALIFORNIA NATIVE PLANT SOCIETY et al., Plaintiffs and Appellants,
v.
CITY OF SANTA CRUZ et al., Defendants and Respondents.

958

**COUNSEL**

Wittwer & Parkin, William P. Parkin, Jonathan Wittwer and Jennifer Bragar for Plaintiffs and Appellants.

Remy, Thomas, Moose & Manley, James G. Moose, Amy R. Higuera; Atchison, Barisone, Condotti & Kovacevich and John G. Barisone for Defendants and Respondents.

**OPINION**

**McADAMS, J.**—This case arises under the California Environmental Quality Act (CEQA).[1]

Acting through its city council, respondent City of Santa Cruz (City) approved a master plan for Arana Gulch, a City-owned greenbelt property. In approving that project, the City certified an environmental impact report (EIR). As acknowledged in the EIR and in findings made by the City, the project will have a significant effect on the habitat of the Santa Cruz tarplant due to the chosen alignment of a multiuse trail. The City nevertheless found that overriding considerations warranted approval.

Claiming CEQA violations, appellants California Native Plant Society and Friends of Arana Gulch petitioned the superior court for a writ of mandate, naming as respondents the City and its city council. The court denied the petition. On appeal, appellants continue to press their claim that the City

---

[1] Public Resources Code section 21000 et seq.; further unspecified statutory references are to that code.

violated CEQA by failing to properly analyze feasible alternatives to the project, particularly an offsite location for the east-west multiuse trail.[2]

We find no violation of CEQA's procedural mandates. We also find substantial evidence in the administrative record to support the City's actions. We therefore affirm the superior court judgment denying appellants' writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Project*

The project whose approval is challenged here is the Arana Gulch Master Plan. The master plan addresses both public uses and resource management for the site.

### The Site

As described in the draft master plan, "Arana Gulch is a scenic natural area situated along the eastern boundary of Santa Cruz. This 67.7-acre City-owned property features unique natural resources such as coastal prairie, Santa Cruz tarplant, and riparian and wetland habitat areas of Arana Gulch Creek. Bounded by neighborhoods and the Santa Cruz Harbor, this refuge of open space—with rich biological diversity, sweeping vistas, and tranquility—is of great value to the people of Santa Cruz."

### Planning Background

The draft master plan chronicles the planning process for Arana Gulch.

As that document explains, the master plan "evolved from planning efforts spanning over two decades." The impetus for those efforts was the 1979 approval by city voters of Measure O, which identified greenbelt parcels for preservation. Among the designated parcels was Arana Gulch, which was then in private ownership. In 1992, city voters approved Measure I, which "required preparation and adoption of a Greenbelt Master Plan." A greenbelt master plan planning and feasibility study was completed two years later.

---

[2] In the superior court, appellants also claimed CEQA violations based on the asserted failure (1) to delineate wetlands and (2) to analyze impacts to an environmentally sensitive habitat area (ESHA). In this court, appellants' CEQA claim rests solely on the alternatives analysis and related findings. We limit our analysis to that claim. (See, e.g., *Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 611 [107 Cal.Rptr.2d 489].)

In 1994, the City purchased Arana Gulch, which then comprised 63 acres. Shortly after purchasing it, the City opened the property for public use. "Years prior to this purchase, the City had acquired a narrow strip of land in the central portion of the property, approximately 4.7 acres. This strip of land was originally intended for a roadway extension between Broadway Avenue and Brommer Street."

In 1997, the city council approved the Arana Gulch Interim Management Plan. It "did not include any land use decisions, which were intended to be addressed at a future date in a long-term Master Plan."

"In late 2003, the City began the planning process for the *Arana Gulch Master Plan.* As an initial step, the Parks and Recreation Department sought direction from City Council regarding specific uses for Arana Gulch.[3] In October 2003, the Council directed that the following uses be included in the Draft Master Plan: resource enhancement and protection, a trail system that includes an east-west multi-use trail, interpretive displays and overlook areas."

The Arana Gulch draft master plan also summarizes the evolution of the proposed east-west multiuse pathway connecting Broadway Avenue and Brommer Street through Arana Gulch. "The *City's General Plan* (1992) and the *Greenbelt Master Plan* (1994) identified the concept of an east-west bicycle/pedestrian connection between the City and County of Santa Cruz. In 1995, an initial Scope of Work for this bicycle/pedestrian path connection was prepared. Since that time, the proposed pathway and alternative routes have undergone several rounds of environmental evaluation and review. [¶] In May 2003, the City Council certified the environmental document— *Broadway-Brommer Bicycle/Pedestrian Path Connection Environmental Impact Report/Environmental Assessment*—but did not take action on the project itself." Instead, the city council decided to proceed with the Arana Gulch Master Plan, specifically including an east-west multiuse trail.

*Elements of the Master Plan*

Elements of the project are described both in the draft master plan for Arana Gulch and in the EIR. The principal master plan components are (1) resource protection and enhancement and (2) public use, including trails.

---

[3] Various uses for the property had been proposed or recommended over the years. In the 1994 greenbelt planning study, the recommended uses for Arana Gulch were "protection of views, habitats, and watershed areas, nature preserve areas, trails (nature, hiking and bicycle), a playground, a sports field, picnic sites, a restroom, and small parking areas." The 1997 interim management plan noted "potential development scenarios within a portion of Arana Gulch, including the possibility of residential use to recover some of the acquisition cost." Use as a school site had been considered there as well.

<u>Resource Management</u>: The draft master plan states that "a key goal is to preserve and restore coastal prairie habitat, particularly Santa Cruz tarplant populations." As one part of the plan for achieving that goal, "a long-term adaptive management program" for the Santa Cruz tarplant was developed, as detailed in an appendix to the master plan. Another part of the plan was "to close unauthorized trails that transect the areas with the highest tarplant populations." Additionally, the master plan "calls for the establishment of designated interpretive multi-use and pedestrian trails . . . designed to minimize and avoid disruption to higher density tarplant populations."

<u>Public Use</u>: As explained in the draft master plan: "An interpretive trail system is the focus of public use within Arana Gulch. The proposed trail system, totaling approximately 2 miles, would provide public access for pedestrians, wheelchair users, and bicyclists." More than two thirds of the system, "approximately 1.4 miles, would be limited to pedestrian use" (including leashed dogs), with the remainder devoted to multiuse trails "designed for pedestrian, bicycle, wheelchair, and on-leash dog use." "The multi-use trails would include Arana Meadow, Creek View, and Canyon Trails." They "would feature a hardened surface and gradient that is compliant with the Americans with Disabilities Act (ADA) requirements." Their width would not exceed eight feet, except as needed "to accommodate interpretive displays and nature viewing areas." The multiuse trails "would enable visitors of all abilities to experience and learn about the different habitat areas" and would "also provide key trail connections between adjoining neighborhoods and the coastline. Together, Canyon View and Creek View Trail would provide a continuous west-east trail connection through the Arana Gulch property and Upper Harbor."

*Environmental Review*

*The Draft EIR*

The draft environmental impact report (DEIR) was "made available for public review on March 1, 2006." It comprises 240 pages, plus appendices.

<u>Objectives</u>: The DEIR lists 10 project objectives, divided into two categories. Four objectives are listed under the heading "Resource Protection and Enhancement," including this one: "Implement an adaptive management program to ensure the long-term viability of the Santa Cruz tarplant within

Arana Gulch."[4] Six objectives are listed under the heading "Public Use," including this one: "Provide trail connections through Arana Gulch that provide access from adjacent communities to the coastline and the Monterey Bay National Marine Sanctuary Trail. Provide multi-use trail connections that comply with Americans with Disabilities Act (ADA) requirements and provide pedestrian, wheelchair and bicycle access."[5]

Proposed Project: In describing the project—the Arana Gulch Master Plan—the DEIR refers to that plan, provides a detailed summary of it, and attaches its table of contents as an appendix.

Impacts and Mitigation: The DEIR includes a chapter entitled "Environmental Setting, Impacts and Mitigation Measures." As relevant here, that chapter describes the biological resources of Arana Gulch, including the Santa Cruz tarplant. It summarizes the anticipated biological impact of the project on the tarplant habitat, along with proposed mitigation measures.

In terms of impacts, the DEIR notes that some of the trails proposed in the master plan "would pass through, or near the boundary of" four areas of Arana Gulch identified as historic tarplant habitat (areas A, B, C & D). The DEIR states: "Any routing of trail segments through historic Santa Cruz tarplant habitat would represent a direct loss of habitat for the species." In recent years, only small numbers of plants were observed in areas B, C, and D. "It is assumed, however, that a seed bank may still be present throughout these historic areas of tarplant occurrence. Thus, with appropriate management measures, the species could potentially be restored to those areas from the dormant seed bank." The DEIR continues: "Loss of tarplant habitat would be relatively greater with the multi-use trails . . . because these trails would be 8 feet wide, as compared to the pedestrian-only trails which would be 18 to 24 inches wide. To the extent that these trails cannot be routed to avoid the tarplant habitat . . . , this would be an impact that cannot be fully mitigated."

---

[4] The other objectives related to resources are: "Protect and enhance sensitive habitat areas, including coastal prairie, riparian woodland, and wetlands." "Educate the public about nature resource protection and enhancement through interpretive displays and programs." "Reduce sedimentation through: a) stabilization and restoration of eroded areas; b) trail improvements; and, c) other Best Management Practices."

[5] The other objectives related to public use are: "Provide a trail system that allows public access within habitat areas in a manner that does not result in significant degradation of habitat values." "Provide areas for nature viewing and interpretive displays. Ensure that interpretive displays are designed to complement and blend with the natural environment." "To protect sensitive habitat areas, restrict dogs to on-leash use at all times on designated trails." "Close unauthorized, non-designated pathways." "Provide no new vehicle parking within the Arana Gulch boundaries, as there is adequate existing parking near entrances."

To lessen these impacts, the DEIR identifies five mitigation measures, including these two: (a) "To the maximum extent feasible, all trail segments shall be aligned to avoid the mapped historic extent of the four Santa Cruz tarplant areas." (Italics omitted.) (b) "The Santa Cruz Tarplant Management Program . . . shall be fully implemented." (Italics omitted.) But the report nevertheless observes: "The combination of the above measures would reduce this impact, but the impact would remain significant and unavoidable because it cannot be fully ensured that all tarplant habitat would be protected." (Italics omitted.)

Alternatives: The DEIR has a chapter devoted to alternatives. It evaluates four alternatives: (1) the "No Project Alternative"; (2) the "Reduced Creek View Trail Alternative"; (3) the "Unpaved Trail System with Hagemann Gulch Bridge Alternative"; and (4) the "Unpaved Trail System without Hagemann Gulch Bridge Alternative." The DEIR summarizes the four alternatives as follows:

Alternative 1 "would keep the site in its existing condition. No Master Plan and no Santa Cruz Tarplant Adaptive Management Program would be adopted. Management actions would be limited and the *Arana Gulch Interim Management Plan* would remain in effect. No new trails would be developed on the site. This alternative would eliminate most of the project impacts but would not contribute to the achievement of any of the project objectives."

Alternative 2 "would include the same trail system as the proposed project but would not include any trail segments within Port District property. Trail access to Arana Gulch would continue to be provided by the existing trail segment along the western edge of the dry storage area at the Upper Harbor. This alternative would include the long-term Santa Cruz Tarplant Adaptive Management Program."

Alternative 3 "would have the same trails as the proposed project except that no trails would be paved and no trails would comply with Americans with Disabilities (ADA) requirements. Due to unpaved surfaces and gradients, trails would not be accessible for wheelchairs and some types of street bicycles. Without funding for paved, multi-use trails, there would be uncertainty about funding and implementing the Santa Cruz Tarplant Adaptive Management Program."

Alternative 4 "would provide unpaved trails and would not include the Hagemann Gulch Bridge proposed by the project. This alternative would provide public access for pedestrians and some bicyclists but would not comply with ADA requirements. Since no bridge across Hagemann Gulch would be constructed, this alternative would not provide a new west entrance

or east-west trail connection. As with Alternative 3, all trails would remain unpaved. Without funding for paved, multi-use trails, there would be uncertainty about funding and implementing the Santa Cruz Tarplant Adaptive Management Program."

Following this summary, the DEIR discusses the alternatives in greater depth. As part of that discussion, the DEIR includes two tables, one comparing the environmental impacts of the project alternatives after mitigation and another showing the relationship of the alternatives to project objectives.

The DEIR concludes that alternative 4 "would be the environmentally superior alternative, because it provides for the least amount of construction at the site. Thus, on-site resources such as Santa Cruz tarplant, wetlands, and other habitat would be least affected." But the DEIR also states: "This alternative would not meet the project objectives of providing ADA-compliant, multi-use trails and would not provide a new west entrance and connection to the Seabright neighborhood. Thus, access within Arana Gulch would be significantly limited compared to the proposed project. Additionally, funding may not be available for long-term resource management of the site, specifically the Santa Cruz Tarplant Adaptive Management Program."

### Public Comments

During the public review period for the DEIR, numerous comments were received, including a letter from appellants. Appellants' letter enumerated 20 separate questions or criticisms; three pertain to the issues raised here.

As relevant to this appeal, appellants first complained that the project objectives were defined too narrowly, resulting "in a skewed alternatives analysis." According to appellants, since ADA-compliant (Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et seq.), multiuse trails are listed as a project objective, the alternatives should include such trails, "which are assumed to be an essential part of the Project." By excluding such a key component, appellants argued, "the alternatives analysis would be pointless."

In addition, appellants took issue with the DEIR's conclusion that "funding for tarplant management is uncertain for Alternatives 3 and 4." In their words: "This is clearly a ruse. The fact that there will still be development associated with these proposals means that mitigations will have to be proposed to mitigate for significant environmental impacts, including impacts to the tarplant."

Finally, appellants commented: "The Master Plan clearly includes the Broadway-Brommer Bicycle/Pedestrian Path Connection. Yet, the DEIR fails

to address off-site alternatives for this connection. If this is a Project Objective as stated, then in order for the DEIR to be legally sufficient, it must address off-site alternatives for this connection."

*The Final EIR*

The final environmental report (FEIR) was presented in May 2006. As explained in its introduction, the FEIR is "prepared in the form of an addendum to the DEIR, responds to public comments on the DEIR, revises the DEIR as necessary, and provides a Mitigation Monitoring and Reporting Program for the project." In its response to public comments, the FEIR addresses each point raised by appellants, including the three mentioned above.

As relevant here, the FEIR first responds to appellants' comment that the project objectives were unduly narrow and thus skewed the alternatives analysis. Concerning project objectives, the FEIR states: "The objectives outlined in the DEIR are not considered so narrow that they preclude the development of reasonable alternatives. . . . The objective of developing multi-use trails and trail connections allows a variety of means for such trails to be provided within Arana Gulch. For example, such objectives allow a multitude of alignments to be selected within the 67-acre property." Concerning alternatives, the FEIR states: "The four alternatives evaluated in Chapter 5 of the DEIR are considered to be a reasonable range of alternatives. While each alternative does not necessarily achieve all of the identified project objectives, the City's decision makers can easily select any of the alternatives rather than the proposed project, and each alternative would still provide the City with a Master Plan for Arana Gulch. Only the 'No Project' alternative fails to achieve most of the identified project objectives which is quite common in CEQA documents."

Next, in a master response about funding for tarplant management (a point raised by appellants and others), the FEIR states: "The Santa Cruz Tarplant Adaptive Management Program . . . must be funded by the City in order to fulfill the EIR mitigation measure requirements for the proposed project and Alternative 2. Funding of the Adaptive Management Program would not be required for the No Project and other alternatives; however, the City Council could still decide to fund the Adaptive Management Program, regardless of which alternative is selected. Because there would not be a requirement to fund it, the Draft EIR states that there is uncertainty regarding funding."

Third, the FEIR addresses the issue of an offsite alternative in another master response as follows: "An off-site alternative was not addressed because the proposed project is a Master Plan for the 67.7-acre Arana Gulch

property. The off-site component of the multi-use trail [the Port District segment] is addressed as part of the proposed project because this is directly linked to the on-site trail and is required to be addressed by CEQA as part of the whole action. . . . Any off-site alternative that is outside the boundaries of Arana Gulch would not meet the intent of developing a Master Plan for Arana Gulch. . . . Off-site alternatives for the bicycle trail were already addressed in the EIR/EA on the Broadway-Brommer Bicycle/Pedestrian Path Connection which is addressed [in] the DEIR."

On July 10, 2006, the City prepared an addendum to the FEIR to address typographical errors and an inadvertent omission.

### Consideration by Advisory Bodies

The draft master plan identified two advisory bodies for the project: (1) the City's parks and recreation commission, which was "the lead advisory body to the City Council for review of the *Arana Gulch Master Plan* and EIR" and (2) the City's planning commission, which had advisory responsibility "for the General Plan Amendments, rezoning, and annexation of County parcels."

On June 26, 2006, the parks and recreation commission considered the Arana Gulch Draft Master Plan and EIR. The hearing began with a staff report. The staff representative responded to commissioners' questions about the absence of offsite trail alternatives through Frederick Street Park.[6] The staff report was followed by public comment. After discussion among its members, the commission voted four to two against recommending EIR certification to the city council. By the same margin, the commission also "recommended . . . that the City Council reject the Arana Gulch Master Plan and direct staff to prepare a new Master Plan that does not include a bridge over Hagemann Gulch." The commission's vote ran counter to the recommendation of its staff, which was to approve "the Arana Gulch Master Plan as presented to City Council."

---

[6] The staff representative explained that "the project that was before the City Council for the previous ten years was a bicycle/pedestrian/wheelchair accessible path connecting the east and west. And it looked at different alternatives. Arana Gulch was just one of the routes. That was the project. It was a bicycle/pedestrian path project. [¶] The project before you today is a long-term Master Plan for a 67-acre area which is called Arana Gulch. So, therefore, the only alternatives that are included are alternatives within the Arana Gulch property." She also stated: "Frederick Street does not provide access for disabled people within Arana Gulch, and it does not provide a new west entrance to Arana Gulch."

During discussion by the commission, the absence of offsite alternatives came up again. The staff representative stated: "It's confusing to explain. The project before you is Arana Gulch. The project is not an east-west pathway; therefore, what's in the EIR is alternatives that still provide a park master plan that do not include a paved east-west connection. So that is the means of this department providing an alternative."

On July 6, 2006, the planning commission considered the Arana Gulch EIR together with proposed zoning and plan amendments that would be necessary in the event of approval of the Arana Gulch Master Plan. After a staff report, public comment, and discussion, the planning commission voted five to zero to recommend certification of the EIR and adoption of the necessary amendments to the local coastal plan and general plan.

*Project Approval*

On July 11, 2006, the city council conducted a public meeting to consider approval of the Arana Gulch Draft Master Plan. First, city staff members explained the project and the environmental review process. Those reports were followed by public comments. The city council then discussed and voted on the Arana Gulch Draft Master Plan.

Staff Reports: Reports were presented by parks and recreation department staff, planning department staff, and the environmental consultant for the project. The environmental consultant confirmed that "the mitigation measures in the EIR will reduce potential environmental impacts to less than significant, except for the impact related to the historic Santa Cruz tar plant habitat." Nevertheless, she stated, "the majority of the tar plant habitat is protected." As the consultant explained: "Area A which has included the highest population historically and in recent years is completely avoided by the multiuse trails" but "the trails would pass nearby or through areas B, C and D" of the tarplant habitat. She further explained: "Because there may be tar plant seed bank within the footprint of the paved trails, the EIR took a conservative approach and defined the impact as significant and unavoidable. It should be noted that there is uncertainty about the location and viability of the seed bank." Nevertheless, the consultant advised, given the identified impact to tarplant habitat, "the City must adopt a Statement of Overriding Considerations in order to approve the Master Plan."

Speakers' Comments: Dozens of people spoke at the hearing, offering comments for or against the project or its components.

Speaking in favor of the inclusion of multiuse trails in the master plan, several people cited wheelchair accessibility. A number of individuals favored the multiuse trails based on the need for safe bicycle route alternatives. Still others spoke of the environmental benefits of promoting alternative transportation. Among those urging adoption of the EIR and master plan was the former executive director of the regional transportation commission, who described the proposed multiuse trail as "the most critical bike and pedestrian path project in this county for this region."

Other members of the public spoke against the inclusion of paved trails through Arana Gulch, citing environmental and other concerns, including the

need for protection of the Santa Cruz tarplant habitat. Representatives of appellants California Native Plant Society and Friends of Arana Gulch were among those speaking in opposition to project approval.

Council Discussion: In discussing the motion to approve the master plan, several city council members spoke about the multiuse trails. Councilmember Coonerty stated that "the important issue for me here is about access." In his words, "we need to make public spaces available to—accessible to everybody. And that's an incredibly important value. And that includes . . . our open spaces." Councilmember Madrigal agreed, saying: "I just think that our natural environment, our greenbelt should not be an exclusive area. And so whatever we can do to try and increase access to that, we should do that." According to Councilmember Mathews: "We also take to heart the importance of providing transportation alternatives. No one can look at the situation and think we need only one east-west, or even two east-west bike routes. That's a major corridor and we need several good ones, and this can be one of them."

Council Action: By a vote of six to zero, the city council adopted a resolution certifying the FEIR for the Arana Gulch Master Plan. In a separate resolution, the city council adopted findings of fact and a statement of overriding considerations, which are contained in a 36-page exhibit. As relevant here, the findings of fact conclude that each of the alternatives analyzed in the EIR is infeasible for failure to satisfy project objectives and on policy grounds. In its statement of overriding considerations, the city council identified "economic, social, or other benefits that render acceptable the significant and unavoidable effect on the Santa Cruz tarplant" including improved access for people with disabilities and trail connections to coastal resources. The city council also took other actions related to approval of the Arana Gulch Master Plan, including amending the local coastal plan and making zoning changes.

*Trial Court Proceedings*

On August 10, 2006, appellants filed a petition for writ of mandate in superior court. In January 2007, the administrative record was lodged with the court; it contains more than 8,700 pages. The following month, respondents answered the petition. The parties submitted extensive briefing, with the final brief filed by appellants in May 2007.

In September 2007, the court conducted a hearing on the petition. In October, the court issued a tentative decision in respondents' favor. Later that month, after appellants had responded to the tentative decision and respondents had submitted a proposed statement of decision, the court held another hearing. In November, the court filed a final decision denying the petition.

In January 2008, the court issued its order and judgment denying the petition.

*Appeal*

Appellants brought this timely appeal. In this court, appellants assert CEQA violations based on the analysis of alternatives in the EIR and the subsequent infeasibility findings by the city council.

## LEGAL PRINCIPLES

As a framework for our discussion of the issues raised in this appeal, we begin by summarizing the principles of law that govern our analysis.

## I. *Environmental Protection Under CEQA*

■ "The Supreme Court has repeatedly observed that the Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1660 [1 Cal.Rptr.2d 767] (*Marin Water*).) To further that purpose, "CEQA contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are *feasible* alternatives or *mitigation measures*' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98 [45 Cal.Rptr.3d 674].) CEQA nevertheless "permits government agencies to approve projects that have an environmentally deleterious effect, but [it] also requires them to justify those choices in light of specific social or economic conditions." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1233 [32 Cal.Rptr.2d 19, 876 P.2d 505], citing § 21002.)

## A. *The Environmental Impact Report*

■ The "heart of CEQA" is the EIR. (*Marin Water, supra,* 235 Cal.App.3d at p. 1660; see *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta II*).) "The EIR, with all its specificity and complexity, is the mechanism prescribed by CEQA to force informed decision making and to expose the decision making process to public scrutiny." (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 910 [100 Cal.Rptr.2d 173] (*Planning &*

*Conservation League*).) The requirements governing EIR's are set forth in the statute and in the CEQA guidelines.[7]

■ "A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1197 [24 Cal.Rptr.3d 543] (*Federation II*).) "The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements." (*Ibid.*)

■ The process begins with notice to the public that the lead agency is preparing a draft EIR. (§ 21092; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) After public review, "the draft EIR is evaluated in light of comments received." (*Laurel Heights*, at p. 391.) "The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process." (*Ibid.*) "The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project." (*Ibid.*) An agency may utilize staff or "consultants to prepare the EIR" but it "must use its independent judgment" in considering the information. (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 725 [77 Cal.Rptr.2d 1], disapproved on another point in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564]; see Guidelines, § 15084, subds. (a), (d), (e).) "Because the EIR must be certified or rejected by public officials, it is a document of accountability." (*Laurel Heights*, at p. 392; accord, *Sierra Club v. State Bd. of Forestry, supra*, 7 Cal.4th at p. 1229.)

" 'Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 [29 Cal.Rptr.2d 492] (*Concerned Citizens*); see also, e.g., *Laurel Heights, supra*, 47 Cal.3d at pp. 406–407.) Nevertheless, given the key role of the EIR in carrying out

---

[7] The guidelines are found in the California Code of Regulations, title 14, section 15000 et seq. (Guidelines). As the California Supreme Court recently reaffirmed: "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

CEQA's requirements, "the integrity of the process is dependent on the adequacy of the EIR." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*).)

### B. *Alternatives*

■ "CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 [77 Cal.Rptr.3d 578, 184 P.3d 709] (*In re Bay-Delta*).) According to the Guidelines: "An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a).)

■ "The basic framework for analyzing the sufficiency of an EIR's description of alternatives is set forth" in the statute, in the CEQA Guidelines, and in *Goleta II, supra*, 52 Cal.3d 553. (*In re Bay-Delta, supra*, 43 Cal.4th at pp. 1162–1163.) Under those authorities, the analysis of alternatives is evaluated against a rule of reason. (*Goleta II*, at p. 565; Guidelines, § 15126.6, subds. (a), (f).)

#### 1. *Range of Alternatives*

■ Project alternatives "typically fall into one of two categories: on-site alternatives, which generally consist of different uses of the land under consideration; and off-site alternatives, which usually involve similar uses at different locations." (*Goleta II, supra*, 52 Cal.3d at p. 566.) But "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Ibid.*) "An EIR need not consider every conceivable alternative to a project." (Guidelines, § 15126.6, subd. (a); see *In re Bay-Delta, supra*, 43 Cal.4th at p. 1163.) "Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation." (Guidelines, § 15126.6, subd. (a).) No single factor "establishes a fixed limit on the scope of reasonable alternatives." (*Id.*, subd. (f)(1).)

#### 2. *Level of Analysis*

■ "An EIR's discussion of alternatives must contain analysis sufficient to allow informed decision making." (*Laurel Heights, supra*, 47 Cal.3d at

p. 404.) It also "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project" thereby fostering "meaningful participation and criticism by the public." (*Id.* at p. 405.) "As with the range of alternatives that must be discussed, the level of analysis is subject to a rule of reason." (*Id.* at p. 407.)

## C. Feasibility

■ "In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' " (*Goleta II, supra,* 52 Cal.3d at p. 565.) "An EIR need not consider . . . alternatives that are infeasible." (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1163; see Guidelines, § 15126.6, subd. (a).) As statutorily defined, " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; see also Guidelines, § 15364 [same definition but with addition of "legal" factors].)

■ "Among the factors that may be taken into account when addressing the feasibility of alternatives are site suitability, economic viability, availability of infrastructure, general plan consistency, other plans or regulatory limitations, jurisdictional boundaries (projects with a regionally significant impact should consider the regional context), and whether the proponent can reasonably acquire, control or otherwise have access to the alternative site (or the site is already owned by the proponent)." (Guidelines, § 15126.6, subd. (f)(1).) As to that last factor, "the government's power of eminent domain and access to public lands suggest that alternative sites may be more feasible, more often, when the developer is a public rather than a private agency." (*Goleta II, supra,* 52 Cal.3d at p. 574.)

■ The issue of feasibility arises at two different junctures: (1) in the assessment of alternatives in the EIR and (2) during the agency's later consideration of whether to approve the project. (See *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 489 [14 Cal.Rptr.3d 308] (*Mira Mar*).) But "differing factors come into play at each stage." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2009) § 15.9, p. 740.) For the first phase—inclusion in the EIR—the standard is whether the alternative is *potentially* feasible. (*Mira Mar,* at p. 489; Guidelines, § 15126.6, subd. (a).) By contrast, at the second phase—the final decision on project approval—the decisionmaking body evaluates whether the alternatives are *actually* feasible. (See Guidelines, § 15091, subd. (a)(3).) At that juncture, the decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible. (*Mira Mar,* at p. 489.)

### D. *Approval Despite Environmental Impact*

■ Under CEQA, "a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process." (*Federation II, supra*, 126 Cal.App.4th at p. 1198.)

■ As relevant here, a project with significant environmental impacts may be approved only if the decisionmaking body finds (1) that identified mitigation measures and alternatives are infeasible and (2) that unavoidable impacts are acceptable because of overriding considerations. (§ 21081, subds. (a)(3), (b); Guidelines, §§ 15043, 15091, 15093; *Federation II, supra*, 126 Cal.App.4th at p. 1198.)

#### 1. *Infeasibility Findings*

■ Where an EIR has identified significant environmental effects that have not been mitigated or avoided, the agency may not approve the project unless it first finds that "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report." (§ 21081, subd. (a)(3); see Guidelines, § 15091, subd. (a)(3).) For these purposes, rejected alternatives must be "truly infeasible." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 369 [46 Cal.Rptr.3d 355, 138 P.3d 692] (*Marina*).)

"The required findings constitute the principal means chosen by the Legislature to enforce the state's declared policy 'that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . .' " (*Marina, supra*, 39 Cal.4th at p. 350, quoting § 21002.)

■ "If the agency finds certain alternatives to be infeasible, its analysis must explain in meaningful detail the reasons and facts supporting that conclusion. The analysis must be sufficiently specific to permit informed decision-making and public participation, but the requirement should not be construed unreasonably to defeat projects easily." (*Marin Water, supra*, 235 Cal.App.3d at p. 1664.) The infeasibility findings must be supported by substantial evidence. (§ 21081.5; Guidelines, § 15091, subd. (b).)

## 2. Overriding Considerations

Before approving a project with significant unavoidable environmental impacts, a public entity must make an express written determination that the project's benefits outweigh any potential environmental harm. (§ 21081, subd. (b); Guidelines, §§ 15043, 15093; *Marina, supra,* 39 Cal.4th at p. 350.) As provided in section 21081, subdivision (b), the agency must find "that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." Such a determination "is known as a statement of overriding considerations." (*Federation II, supra,* 126 Cal.App.4th at p. 1198, citing Guidelines, § 15093.)

"A statement of overriding considerations is not a substitute for the [infeasibility] findings required by Public Resources Code section 21081, subdivision (a)." (*Federation II, supra,* 126 Cal.App.4th at p. 1201; see Guidelines, § 15091, subd. (f).) "Rather, a statement of overriding considerations supplements those findings and supports an agency's determination to proceed with a project despite adverse environmental effects." (*Federation II,* at p. 1201.) It "is intended to demonstrate the balance struck by the body in weighing the 'benefits of a proposed project against its unavoidable environmental risks.' (Guidelines, § 15093, subds. (a) and (c).)" (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222 [13 Cal.Rptr.2d 182].) "While the mitigation and feasibility findings typically focus on the feasibility of specific proposed alternatives and mitigation measures, the statement of overriding considerations focuses on the larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like." (*Concerned Citizens, supra,* 24 Cal.App.4th at p. 847.)

The override decision "lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*Marina, supra,* 39 Cal.4th at p. 368.) Override findings are sufficient if they "demonstrate the balance struck" by an agency in "weighing the benefits of the proposed project against its unavoidable adverse impacts." (*Concerned Citizens, supra,* 24 Cal.App.4th at p. 849.) Additionally, "a statement of overriding considerations must be supported by substantial evidence contained in 'the final EIR and/or other information in the record.' (Guidelines, § 15093, subd. (b).)" (*Sierra Club v. Contra Costa County, supra,* 10 Cal.App.4th at p. 1223.)

## II. Judicial Review

### A. Mandamus Proceedings

 "Quasi-legislative acts are ordinarily reviewed by traditional mandate, and quasi-judicial acts are reviewed by administrative mandate." (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1389 [61 Cal.Rptr.2d 297]; see also, e.g., *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*).) "Review under administrative mandamus (§ 21168) and review under traditional mandamus (§ 21168.5) share many of the same characteristics. There is no practical difference between the standards of review applied under traditional or administrative mandamus." (*Friends of the Old Trees v. Department of Forestry & Fire Protection*, at p. 1389.)

### B. Review Standards

Under CEQA, courts review quasi-legislative agency decisions for an abuse of discretion. (§ 21168.5.) At both the trial and appellate level, the court examines the administrative record anew. (*Vineyard, supra*, 40 Cal.4th at p. 427.)

An "agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence." (*Vineyard, supra*, 40 Cal.4th at p. 435, citing § 21168.5.) "Judicial review of these two types of error differs significantly . . ." however. (*Vineyard*, at p. 435.) For that reason, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Ibid.*)

#### 1. Procedural Claims

Courts must "scrupulously enforce all legislatively mandated CEQA requirements." (*Goleta II, supra*, 52 Cal.3d at p. 564.) To do so, "we determine de novo whether the agency has employed the correct procedures" in taking the challenged action. (*Vineyard, supra*, 40 Cal.4th at p. 435.)

#### 2. Substantive Claims

Compared with review for procedural error, "we accord greater deference to the agency's substantive factual conclusions." (*Vineyard, supra*, 40 Cal.4th at p. 435.) We apply "the highly deferential substantial evidence standard of

review in Public Resources Code section 21168.5" to such determinations. (*Western States, supra,* 9 Cal.4th at p. 572.) "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision." (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 117.) That deferential review standard flows from the fact that "the agency has the discretion to resolve factual issues and to make policy decisions." (*Id.* at p. 120.)

The CEQA Guidelines define substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

## CONTENTIONS

According to appellants, "the City Council adopted a Statement of Overriding Considerations approving the Project with significant and unavoidable impacts despite the fact that there are feasible alternatives. These actions violated CEQA and sand-bagged the public because it was already told there were feasible alternatives." Moreover, appellants assert, the City was required to consider an offsite alternative for the ADA-compliant, multiuse trail, since it was a key objective of the project. By failing to do so, appellants maintain, the City did not foster the informed decisionmaking and public participation that CEQA requires.

The City disagrees. Asserting the existence of substantial evidence in the administrative record as a whole, the City defends the alternatives considered in the EIR, as well as its ultimate determinations of infeasibility and overriding considerations.

## ANALYSIS

In essence, appellants attack and we therefore evaluate (1) the range of alternatives analyzed in the EIR, and (2) the city council's findings that the alternatives were infeasible. As explained below, appellants' contentions are based on erroneous factual and legal assumptions. First, concerning the project alternatives, appellants' arguments are predicated on the misapprehension that the east-west multiuse path was such an important project objective that it must be treated as the project itself. Second, concerning feasibility, appellants are mistaken in their view that the inclusion of potentially feasible alternatives in the EIR precluded the city council's subsequent finding of infeasibility. They also err in asserting that the alternatives are not truly

infeasible. Finally, concerning both areas of inquiry, appellants misstate the applicable review standard.

## I. *Project Alternatives*

In their bid for reversal of the project approval, appellants argue that the alternatives analysis in the EIR is legally inadequate for failure to include any proposals with an ADA-compliant trail. Appellants also urge error in the exclusion of offsite alternatives to the multiuse trail.

### A. *Review Standard*

In pressing their argument concerning the alternatives analysis, appellants urge de novo review, claiming an abuse of discretion under the procedural prong of section 21168.5. Asserting that the City did not proceed in the manner required by law in analyzing alternatives, appellants characterize this CEQA challenge as "primarily the type" involving procedural error by the agency. (See *Vineyard, supra,* 40 Cal.4th at p. 435.)

 An EIR will be found legally inadequate—and subject to independent review for procedural error—where it omits information that is both required by CEQA and necessary to informed discussion. (See, e.g., *Save Our Peninsula, supra,* 87 Cal.App.4th at p. 118; *Planning & Conservation League, supra,* 83 Cal.App.4th at p. 911.) An instructive example of this type of error is provided in *Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th 1215. There, the "record contained no site-specific data regarding the presence of four old-growth-dependent species," and it reflected the agencies' failure to make "site-specific recommendations regarding mitigation measures." (*Sierra Club v. State Bd. of Forestry,* at p. 1236.) Under those circumstances, the "absence of any information regarding the presence of the four old-growth-dependent species on the site . . . made any meaningful assessment of the potentially significant environment impacts of timber harvesting and the development of site-specific mitigation measures impossible." (*Id.* at pp. 1236–1237.) "In evaluating and approving the timber harvest plan in the absence of such data and recommendations the board failed to proceed in the manner prescribed by CEQA." (*Id.* at p. 1236.)

 On the other hand, it "frequently occurs" that "the major disputes are over whether relevant information was omitted from the EIR." (*National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1353 [84 Cal.Rptr.2d 563] (*National Parks*).) Many CEQA challenges thus concern the amount or type of information contained in the EIR, the scope of the analysis, or the choice of methodology. These are factual determinations. (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38

Cal.App.4th 1609, 1620 [45 Cal.Rptr.2d 688].) "A project opponent cannot obtain a more favorable standard of review by arguing that the EIR failed to disclose the conflicting evidence, and therefore the lead agency has not proceeded in a manner required by law; the project opponent must *also* show that the failure to disclose the conflicting evidence precluded informed decisionmaking or informed public participation." (*Ibid.*; accord, *National Parks*, at p. 1353; but see *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1392 [133 Cal.Rptr.2d 718]; see generally Remy et al., Guide to California Environmental Quality Act (11th ed. 2007) pp. 826–828.)

■ To sum up, the omission of required information constitutes a failure to proceed in the manner required by law where it precludes informed decisionmaking by the agency or informed participation by the public. (*Sierra Club v. State Bd. of Forestry, supra*, 7 Cal.4th at p. 1236.) We review such procedural violations de novo. (*Vineyard, supra*, 40 Cal.4th at p. 435.) By contrast, we review an agency's substantive factual or policy determinations for substantial evidence. (*Ibid.*; see also, e.g., *Goleta II, supra*, 52 Cal.3d at pp. 566–567 [substantial evidence supported agency's conclusion that none of the proffered alternative sites "merited extended discussion in the EIR"].)

■ In this case, appellants contend that the City's choice of alternatives resulted in an analysis that was "merely perfunctory," thereby precluding informed decisionmaking and public participation. But appellants do not tether that claim to any specific informational or procedural requirement of CEQA. (Cf. *Planning & Conservation League, supra*, 83 Cal.App.4th at pp. 898, 916 [EIR failed to discuss the required "no project" alternative].) And as noted above, "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR." (*Goleta II, supra*, 52 Cal.3d at p. 566.)

■ In any event, we cannot assess appellants' claim without reviewing the evidence in the administrative record. In examining the evidence here, we are not limited to the EIR itself. (*Goleta II, supra*, 52 Cal.3d at p. 569.) Given the circumstances of this case, we "may consult the [entire] administrative record to assess the sufficiency of the range of alternatives discussed in [the] EIR." (*Ibid.*)

■ In undertaking our review, we bear in mind that it is appellants' burden to demonstrate that the alternatives analysis is deficient. "Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [78 Cal.Rptr.3d 1].)

B. *Background*

As explained above, the master plan calls for paved, multiuse, ADA-compliant trails through Arana Gulch, including an east-west trail that connects Broadway Avenue and Brommer Street by extending onto adjacent Port District property at the Upper Harbor.

The EIR analyzed four alternatives to the project: alternative 1, no project; alternative 2, no trail segments on Port District property; alternative 3, no paved trails; and alternative 4, no paved trails and no bridge over Hagemann Gulch. Of these, only alternative 2 "would include implementation of the Santa Cruz Tarplant Adaptive Management Program as mitigation for paved, multi-use trails." The other alternatives would require some form of tarplant management, but funding for the formal adaptive management program could not be guaranteed. No offsite alternatives for the multiuse trails were included.

C. *Discussion*

We address each of appellants' challenges to the project alternatives in turn. First, we discuss appellants' contentions about the range of alternatives selected. Next, we analyze their arguments about the exclusion of offsite trail alternatives. As to each, we carefully scrutinize whether the City complied with CEQA's procedural mandates. We then consider whether substantial evidence supports the decisions made.

1. *Selection of Alternatives for Discussion in the EIR*

■ To be legally sufficient, the consideration of project alternatives in an EIR must permit informed agency decisionmaking and informed public participation. (*Laurel Heights, supra,* 47 Cal.3d at pp. 404–405; Guidelines, § 15126.6, subds. (a), (f).) What CEQA requires is "enough of a variation to allow informed decisionmaking." (*Mann v. Community Redevelopment Agency* (1991) 233 Cal.App.3d 1143, 1151 [285 Cal.Rptr. 9].) We judge the range of project alternatives in the EIR against "a rule of reason." (*Laurel Heights,* at p. 407.) The selection will be upheld, unless the challenger demonstrates "that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265 [100 Cal.Rptr.2d 301] (*Federation I*).)

a. *The City's Compliance with CEQA's Informational Mandates*

Appellants challenge the range of alternatives in the EIR as skewed, given the project objectives, particularly the objective relating to multiuse trails.[8] (See *Planning & Conservation League, supra,* 83 Cal.App.4th at p. 918 [alternatives must be evaluated "in relation to the objectives of the project"].) In appellants' words, "if the City is of the opinion that the Master Plan must, as a matter of policy, contain an ADA compliant path, then the alternatives must also include ADA compliant paths." They also complain that "the City hid from the public its desire to have an ADA compliant trail."

At the outset, we question several key factual premises underlying appellants' arguments.

The first is appellants' assumption that the City considered an ADA-compliant path "an absolutely necessary component" of the master plan. That assumption is not borne out by the record. As stated in the FEIR, "the City's decision makers can easily select any of the alternatives rather than the proposed project, and each alternative would still provide the City with a Master Plan for Arana Gulch." An ADA-compliant east-west connection is just one objective of the project, out of a total of 10. As respondents observe: "Nothing in the objectives preordained that the proposed Project had to be approved in the precise form described in the Draft EIR." (Cf. *Sierra Club v. City of Orange, supra,* 163 Cal.App.4th at p. 533 [agency has flexibility to implement only part of a project].) In initial planning for the Arana Gulch Master Plan, the city council did direct the inclusion of an east-west multiuse trail in the project; however, it did not dictate the alignment or any other specific attributes of the trail. Nor did the City commit itself to approving the proposed master plan or to selecting a particular trail. (See, e.g., *Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007) 147 Cal.App.4th 181, 192–193 [54 Cal.Rptr.3d 1]; *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 688 [74 Cal.Rptr.2d 497], disapproved on another point in *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131, fn. 10 [84 Cal.Rptr.3d 614, 194 P.3d 344].) The fact that the City approved the project as proposed does not prove, ipso facto, that an ADA-compliant trail was an indispensable component of the master plan.

The second questionable premise is appellants' assertion that "only the proposed project includes ADA compliant trails." To the contrary, as stated in the DEIR, alternative 2 would "provide ADA-compliant north-south and

---

[8] That project objective is: "Provide trail connections through Arana Gulch that provide access from adjacent communities to the coastline and the Monterey Bay National Marine Sanctuary Trail. Provide multi-use trail connections that comply with Americans with Disabilities Act (ADA) requirements and provide pedestrian, wheelchair and bicycle access."

east-west trail connections, as would the proposed project." That alternative "would meet all project objectives except the objective to provide an ADA-compliant trail through the Port District property." Notably, however, without the Port District trail segment, there would be no continuous, paved, east-west connection. We therefore assume that appellants' complaint is not specifically directed to the lack of an alternative to ADA-compliant trails within Arana Gulch, but rather to the absence of an alternative that also accomplishes a complete east-west paved connection. Some statements in appellants' opening brief seem to suggest that that is their real complaint. And appellants' reply brief expresses the point somewhat more directly, saying: "All the alternatives fail to meet the primary objective of providing the east-west bike link or ADA compliant paths."

A third factual error is appellants' assertion that City somehow hid its desire for an ADA-compliant trail. The record belies that assertion. Not only is such a trail included in the project objectives, but it is also discussed in the master plan.

Beyond the question of factual support for the premises underlying appellants' argument, we are not persuaded by the argument itself, which posits that CEQA's informational mandates were violated by the absence of an alternative with an ADA-compliant trail connection. In our view, the EIR in this case does not omit any required information necessary to informed decisionmaking and public participation concerning this issue.

The DEIR discusses multiuse trails, including a long-debated proposal for an east-west path for bicyclists and pedestrians connecting Broadway Avenue and Brommer Street. On this topic, the DEIR notes the existence of "earlier environmental studies for the project site" including the Brommer-Broadway EIR, which the City certified in 2003. The draft master plan for Arana Gulch itself explains that "the proposed pathway and alternative routes have undergone several rounds of environmental evaluation and review." On the same topic of multiuse trails and connections, the FEIR includes and responds to comments provided by appellants and others. As stated in the pertinent responses, the project objectives of "developing multi-use trails and trail connections . . . allow a multitude of alignments to be selected within the 67-acre property."

Taken together, this information satisfies CEQA's informational requirements. It alerts the public and the decisionmaking body to the potential for trail alignments other than those shown in the project or in the alternatives. It tells them that other alignments were considered in prior review processes. It provides the public and decision makers with enough information to compare the project's merits with a reasonable body of current alternatives.

b. *The City's Substantive Determinations in Selecting Alternatives*

As appellants point out, the alternatives discussed in an EIR need not *fully* accomplish all of the project objectives. As provided in the Guidelines: "The range of potential alternatives to the proposed project shall include those that could feasibly accomplish *most of the basic objectives of the project* and could avoid or substantially lessen one or more of the significant effects." (Guidelines, § 15126.6, subd. (c), italics added.) Thus, "the discussion of alternatives shall focus on alternatives to the project or its location which are capable of avoiding or substantially lessening any significant effects of the project, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly." (*Id.*, subd. (b).) "The CEQA Guidelines make clear that the project objectives should drive the agency's selection of alternatives for analysis and approval." (Remy et al., Guide to California Environmental Quality Act, *supra*, at p. 588.)

Contrary to appellants' assertions, however, there is no legal requirement that the alternatives selected must satisfy *every key objective* of the project. This concept finds expression in CEQA case authority. One example is *Mira Mar, supra*, 119 Cal.App.4th 477. In that case, the court rejected the project opponents' contention that the alternatives in the EIR failed to "satisfy CEQA's requirements that an EIR meet basic project objectives and avoid or substantially reduce the project's environmental alternatives." (*Id.* at p. 488.) There, "the primary objective of the project [was] to provide high-density housing consistent with existing planning goals" but there were other objectives as well, including sensitive development of a vacant area. (*Id.* at p. 489.) As the court observed, two reduced density alternatives did "not meet the primary development objective of providing high-density housing," but they did "satisfy all the secondary project objectives. This is sufficient because alternatives need not satisfy all project objecti[ve]s, they must merely meet 'most' of them. (CEQA Guidelines, § 15126.6, subd. (a).)" (*Ibid.*) Another example of this principle is found in *Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th 1383. There, the EIR for a dairy proposal included a "reduced-herd-size alternative" that "was environmentally superior to the proposed dairy because it offered proportionate reduction in air quality impacts and potential impacts on water quality. However, . . . this alternative would not fully meet the project objective because a smaller herd would produce less milk and producing milk is the fundamental objective of the project." (*Id.* at p. 1400.) Evaluation of the reduced-herd-size alternative nevertheless "complied with CEQA." (*Ibid.*)

That same principle applies here. In this case, each alternative meets some of the 10 project objectives. As shown in a matrix in the FEIR, alternative 2 meets nine of the 10 objectives, alternative 3 meets seven, and alternative 4

meets six; even the no-project alternative (alternative 1) meets two of the 10 project objectives. Ranking the relative importance of the various objectives in the overall context of the project was a policy decision entrusted to the city council. The council's ultimate determination that a multiuse east-west connector was a key objective of the project does not undermine the legitimacy of the EIR's alternatives analysis.

### 2. Failure to Analyze an Offsite Trail Alternative in the EIR

Appellants assert: "Because an offsite alternative east-west bike path can completely avoid significant and unavoidable impacts to the Santa Cruz tarplant, alternative locations must be discussed in the EIR."

### a. The City's Compliance with CEQA's Informational Mandates

■ "Whether an EIR must consider the availability of alternative sites to a given project depends upon the particular facts of the case," with "the ultimate objective being whether a discussion of alternatives 'fosters informed decision-making and informed public participation.' " (*Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1751 [12 Cal.Rptr.2d 308].) In assessing the claim that exclusion of offsite alternatives renders the EIR defective, the question is whether the range of alternatives "is unreasonable in the absence of the omitted alternatives." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 15.17, p. 747.)

In appellants' comments on the DEIR, they argued that "in order for the DEIR to be legally sufficient, it must address off-site alternatives for [the Broadway-Brommer bicycle/pedestrian] connection." The FEIR responded with a two-pronged explanation, which first cited the nature of the project as a master plan for this particular property, Arana Gulch, and which also referred to the prior environmental evaluation of offsite trail alternatives.

■ Judged on a purely informational basis, the explanation provided in the response was adequate. "In keeping with the statute and guidelines, an adequate EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029 [68 Cal.Rptr.2d 367].) "While the response need not be exhaustive, it should evince good faith and a reasoned analysis." (*Ibid.*) That was done here. The referenced information adequately informed the public and the decisionmaking body about the existence of offsite alternatives for the bicycle/pedestrian connection and the reasons for excluding them from the analysis. (*Sierra Club v. City of Orange, supra*, 163 Cal.App.4th at

p. 547 [upholding EIR that briefly explained elimination of three possible alternatives]; *Save Our Residential Environment v. City of West Hollywood, supra*, 9 Cal.App.4th at p. 1754 [upholding EIR that briefly "stated its reasons for concluding that no alternative sites to the project were feasible"].)

 b. *The City's Substantive Determination to Exclude Offsite Alternatives*

Turning next to appellants' substantive challenges to the exclusion of an offsite trail alternative, we reject those challenges on three grounds.

■ First, there is no rule requiring an EIR to explore offsite project alternatives in every case. As stated in the Guidelines: "An EIR shall describe a range of reasonable alternatives to the project, *or to the location of the project*, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a), italics added.) As this implies, "an agency may evaluate on-site alternatives, off-site alternatives, or both." (*Mira Mar, supra*, 119 Cal.App.4th at p. 491.) The Guidelines thus do not require analysis of off-site alternatives in every case. Nor does any statutory provision in CEQA "expressly require a discussion of alternative project locations." (119 Cal.App.4th at p. 491, citing §§ 21001, subd. (g), 21002.1, subd. (a), 21061.)

■ Second, this case involves the question of an offsite alternative for a *component* of the project, not for the project itself. "The pertinent statute and EIR guidelines require that an EIR describe alternatives to the proposed *project*." (*Big Rock Mesas Property Owners Assn. v. Board of Supervisors* (1977) 73 Cal.App.3d 218, 227 [139 Cal.Rptr. 445].) That requirement is "applicable only to the project as a whole, not to the various facets thereof, such as grading and access roads." (*Ibid.*; see also *A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 642, fn. 8 [20 Cal.Rptr.2d 228] ["the statutes do not require alternatives to various facets of the project"]; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 745 [22 Cal.Rptr.2d 618] ["[t]he form of property ownership of a project is not an alternative to the project, but is simply an ancillary facet of a project . . ."].)

Appellants attempt to distinguish those authorities on the ground that they "concern whether alternatives must consider various 'facets' of a project, not whether alternatives must include project objectives. A 'key objective' is not a mere 'ancillary facet' of a Project." We find no merit in that position. To the extent that appellants are restating their argument that the alternatives analysis was skewed in light of project objectives, we reject the argument for the

reasons explained above. To the extent that appellants are attempting to elevate the multiuse trail objective to the status of a whole project, that attempt must fail. As defined in the Guidelines, a project "means the whole of an action" and "refers to the activity which is being approved . . . ." (Guidelines, § 15378, subds. (a), (c).) Here, the activity for which approval was sought was the master plan itself. Whatever its importance as a project objective, the multiuse trail is simply one component of a whole project—the Arana Gulch Master Plan.

Our third and final reason for rejecting appellants' substantive claims is that substantial evidence in the administrative record as a whole supports the decision to exclude offsite trail alternatives, which had been the subject of extensive prior consideration. The City had explored many locations for an east-west connection in a long process that culminated in the Broadway-Brommer EIR.[9] As noted in the city council agenda report for May 2003, the Broadway-Brommer EIR itself analyzed three alternatives. In addition, "Staff was also requested to prepare a preliminary evaluation of a Frederick Street Park option for the desired connection."[10]

■ The city council did not take action on the Broadway-Brommer EIR in 2003, nor did it formally incorporate that earlier environmental review into the Arana Gulch EIR in 2006. Nevertheless, as respondents point out, "the

---

[9] For example, according to a March 1997 letter from the City to California's Department of Transportation concerning the Broadway-Brommer connection project: "Eight alternatives (including variations) are proposed including No Build." In July 1997, four "proposed new alternatives" were put forth by the Greenbelt Committee, all connecting to Frederick Park. An August 1997 status report on the Broadway-Brommer connection project observes: "Several alternative alignments have been identified and studied. These alternatives connect by either linking through the Port District to a neighborhood park, Frederick Park, or through an open-space, meadow area, known as Arana Gulch and adjacent to the Port District. The alternatives have generated much discussion among local neighborhood groups, bicycle groups and citizen advisory groups. There continues to be lively discussion on which bicycle/pedestrian alternative should be constructed to connect Broadway to Brommer Street/Seventh Avenue. The various alignments all have different constraints that must be addressed including wetlands, historic structures, endangered plant species and parking impacts. [¶] The complexities of these issues and the various interest groups involved with each have made forming a decision a difficult problem." A map accompanying the status report depicts seven alternative routes.

In November 1999, the Broadway-Brommer DEIR/environmental assessment (EA) was presented. In an executive summary, that report noted that "potential areas of controversy" included alternative alignments. In addition to the three alternatives that it analyzed, the EIR/EA described nine other alternative alignments that had been eliminated.

[10] The May 2003 city council agenda report also notes: "Several Frederick Street Park options were considered in the original alternatives evaluation." An attached table compared "those alternatives to the option considered the environmentally preferred option in the EIR analysis and recommended by staff and the City Transportation Commission." That table reflected several drawbacks to a Frederick Street alternative, including potentially significant impacts on visual and biological resources as well as parking impacts and traffic safety issues.

City had the benefit of this analysis when it prepared the EIR for the Arana Gulch Master Plan." As in *Goleta II*, the City had "already undertaken a study of the environmental suitability of alternative sites . . . ." (*Goleta II*, *supra*, 52 Cal.3d at p. 573 [agency could rely on alternatives explored in its local coastal plan when approving site-specific project].) As explained by commentators, "the agency should determine whether alternative locations have been sufficiently analyzed in a previous document. When a previous document has evaluated a range of reasonable alternatives for projects with the same basic purpose, the EIR may rely on that document if relevant circumstances have not changed." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 15.28, p. 757, citing Guidelines, § 15126.6, subd. (f)(2)(C) & *Goleta II*, *supra*, 52 Cal.3d at p. 573.) In this case, although the two projects are different, the specific component of the Arana Gulch Master Plan at issue here—the east-west multiuse connection— shares some purposes in common with the earlier Broadway-Brommer connection project. Given the exhaustive review of that earlier project, we cannot say that it was "manifestly unreasonable" for the City to decline to revisit the previously rejected alternative path locations. (*Federation I*, *supra*, 83 Cal.App.4th at p. 1265.) Nor do we agree that the range of alternatives was "unreasonable in the absence of the omitted alternatives." (1 Kostka & Zischke, *supra*, § 15.17, p. 747.)

### 3. *Summary of Conclusions*

We find no violation of CEQA's informational mandates in the alternatives analysis. The EIR presented sufficient information to explain the choice of alternatives and the reasons for excluding offsite alternatives for the multiuse trail. The information "did not preclude informed decisionmaking or informed public participation and thus did not constitute a prejudicial abuse of discretion." (*Mira Mar*, *supra*, 119 Cal.App.4th at p. 491.)

As to the City's substantive decisions concerning which alternatives to analyze and which to omit, we find sufficient evidence in the administrative record as a whole to support those determinations. Judged against the rule of reason that governs our review, a reasonable range of alternatives was selected for analysis in the EIR; "no more was required." (*Marin Water*, *supra*, 235 Cal.App.3d at p. 1666.) Nor was there any need to consider an offsite alternative for the multiuse trail, which was merely a component of the larger project. (*Big Rock Mesas Property Owners Assn. v. Board of Supervisors*, *supra*, 73 Cal.App.3d at p. 227.)

## II. *Feasibility Analysis*

■ Pursuant to CEQA's "substantive mandate," an agency may not approve a proposed project if feasible alternatives exist that would substantially lessen its significant environmental effects. (§ 21081; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) In this case, the City found that the four alternatives identified in the EIR were infeasible on policy grounds.

Appellants challenge the City's infeasibility findings on both procedural and substantive grounds. Procedurally, the gist of appellants' argument is that the same feasibility standards apply both to the EIR and to project approval. They assert that the City "created an artificial construct to approve the Master Plan" because the EIR told the public "that there are indeed feasible alternatives" but then "the City Council, at the eleventh hour, contradicted those conclusions and made findings that there were no [feasible] alternatives to the Master Plan that would avoid the impact to the tarplant." Substantively, appellants contend that alternatives were not truly infeasible. Instead, they assert, the city council rejected the alternatives because they did not satisfy the City's preference for a multiuse trail.

### A. *Review Standard*

Arguing for de novo review, appellants contend that feasibility findings present a question of law under the California Supreme Court's recent decision in *Marina, supra*, 39 Cal.4th 341. The *Marina* decision does not support appellants' argument.

In *Marina*, the high court entertained a challenge by the Fort Ord Reuse Authority (FORA) to an EIR for California State University, Monterey Bay (CSUMB), prepared by the university's board of trustees (Trustees). (*Marina, supra*, 39 Cal.4th at p. 345.) The question before the court was "whether the Trustees . . . properly certified the EIR for CSUMB and, on that basis, approved the Master Plan." (*Id.* at p. 355.) Answering that question in the negative, the court agreed with FORA that "the Trustees' decision must be vacated because three findings critical to their decision depend on an *erroneous legal assumption* . . . ." (*Ibid.*, italics added.) The findings were (1) that mitigation was infeasible, (2) that mitigation was "not the Trustees' responsibility" and (3) "that overriding considerations justify certifying the EIR and approving the Master Plan despite the remaining unmitigated effects." (*Ibid.*)

The court observed that the abuse of discretion standard ordinarily "would command much deference to factual and environmental conclusions in the EIR based on conflicting evidence" but found that "no such conclusions" were at issue there. (*Marina, supra,* 39 Cal.4th at p. 355.) Instead, the Trustees' findings were based on the erroneous legal assumption "that voluntary mitigation payments are impermissible." (*Id.* at p. 356; see *id.* at pp. 362, 363.)

As the court explained, the Trustees' incorrect legal assumption was "an *error of law* invalidating their finding that voluntary mitigation payments to FORA do not represent a feasible method of mitigating CSU's off-campus environmental effects." (*Marina, supra,* 39 Cal.4th at p. 365, italics added.) The court reaffirmed earlier precedent holding that "an agency's 'use of an erroneous legal standard constitutes a failure to proceed in a manner required by law' . . . ." (*Id.* at pp. 365–366.) Here, by contrast, appellants make no claim that the challenged decision rests on an erroneous legal standard.

Because they are free of legal error, the infeasibility findings made here are entitled to great deference. (Cf. *Marina, supra,* 39 Cal.4th at p. 368.) They "are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497 [19 Cal.Rptr.3d 1].) We thus review the City's infeasibility findings for substantial evidence. (*Goleta II, supra,* 52 Cal.3d at p. 559 [agency's decision "to reject the alternatives as infeasible was supported by substantial and tenable evidence"].) Our review encompasses the entire administrative record of the proceedings. (*Sierra Club v. County of Napa,* at p. 1503.)

## B. *Background*

The city council adopted findings of fact that address the feasibility of project alternatives. Excerpts are set forth in the margin.[11] Although the

---

[11] According to the findings of fact: (1) alternative 1, the no project alternative, "would not meet the objectives of the Project, and is undesirable from a policy standpoint." (2) "The failure of Alternative 2 to provide an ADA-compliant trail through [Port District] property renders the alternative infeasible within the meaning of CEQA, as the City Council, acting in its legislative capacity, concludes that the alternative would not meet a key objective of the Project, and is undesirable from a policy standpoint." (3) "The failure of Alternative 3 to provide an ADA-compliant public access and certain funding for an Adaptive Management Program renders the alternative infeasible within the meaning of CEQA, as the City Council, acting in its legislative capacity, concludes that the alternative would not meet a key objective of the Project, and is undesirable from a policy standpoint." (4) "The failure of Alternative 4 to provide . . . ADA-compliant trails, nature viewing areas, and interpretive displays, as well as its failure to provide certain funding for an Adaptive Management Program, renders the

findings of fact deny the need to address the question of feasibility, they do so anyway.[12]

 The findings of fact conclude that each of the four alternatives fails to meet certain project objectives and thus "is undesirable from a policy standpoint." The findings of fact support each such infeasibility determination by citation to two cases, *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715 [29 Cal.Rptr.2d 182] (*Sequoyah Hills*) and *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417 [183 Cal.Rptr. 898] (*Del Mar*). As characterized in the findings of fact, the *Sequoyah Hills* case holds that "decision makers may reject as 'infeasible' an alternative that does not fully satisfy the objectives associated with a proposed project" while the *Del Mar* decision stands for the proposition that "the concept of ' "feasibility" under CEQA encompasses "desirability" to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors . . . .' "

## C. *Discussion*

As noted above, appellants raise both procedural and substantive challenges to the infeasibility findings. We address each in turn.

### 1. *Procedural Challenge to the Infeasibility Findings*

Appellants' procedural challenge is based on the premise that the same feasibility standards apply both to the EIR and to project approval. In appellants' words: "The City cannot in a public process [the EIR] tell the public that there are feasible alternatives, and then at the end of the process [project approval] make a contrary conclusion."

The premise of appellants' argument is fundamentally flawed. As stated earlier, the issue of feasibility emerges at two distinct points in the administrative review process: first, in the EIR, and next, during project approval.

---

alternative infeasible within the meaning of CEQA, as the City Council, acting in its legislative capacity, concludes that the alternative would not meet a key objective of the Project, and is undesirable from a policy standpoint."

[12] Citing CEQA case law, the findings conclude that "because adopted mitigation measures will avoid all significant effects but one, and that one significant effect—on the Santa Cruz tarplant—can be 'substantially lessened' through adopted mitigation, the City Council has no obligation, in these findings, to address the feasibility of any of the alternatives set forth in the EIR for the Project. Even so, however, the City Council, in the interests of full disclosure, nevertheless explains why, in its considered judgment, no such alternative is 'feasible' within the meaning of CEQA." (See 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 17.32, p. 828 [noting uncertainty in the law about "what level of impacts remaining after mitigation will trigger the requirement for a statement of overriding considerations"]; Remy et al., Guide to California Environmental Quality Act, *supra*, at pp. 400–402 [same].)

(*Mira Mar, supra,* 119 Cal.App.4th at p. 489; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra,* § 15.9, p. 740; Remy et al., Guide to California Environmental Quality Act, *supra,* at p. 563.) Significantly, different considerations and even different participants may come into play at each of the two phases, as the following discussion illustrates.

### a. *The EIR: Potentially Feasible Alternatives*

■ When assessing feasibility in connection with the alternatives analysis in the EIR, the question is whether the alternative is *potentially* feasible. (*Mira Mar, supra,* 119 Cal.App.4th at p. 489; Guidelines, § 15126.6, subd. (a).) A number of "factors that may be taken into account when addressing the feasibility of alternatives" are listed in the Guidelines. (Guidelines, § 15126.6, subd. (f)(1).) Although the EIR must reflect the agency's independent judgment, its preparation may be delegated to agency staff, outside consultants, or even the project proponent. (Guidelines, §§ 15025, subd. (a)(3), 15084, subds. (a), (d), (e); *Mission Oaks Ranch, Ltd. v. County of Santa Barbara, supra,* 65 Cal.App.4th at p. 725.)

■ While it is up to the EIR preparer to identify alternatives as potentially feasible, the decisionmaking body "may or may not reject those alternatives as being infeasible" when it comes to project approval. (*Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at p. 1504.) Rejection by the decision makers does not undermine the validity of the EIR's alternatives analysis. (*Mira Mar, supra,* 119 Cal.App.4th at p. 489 [dismissing the argument that the "alternatives should not have been included" in the EIR "because the City ultimately rejected them as not feasible"].) Like mitigation measures, potentially feasible alternatives "are suggestions which may or may not be adopted by the decisionmakers." (*No Slo Transit, Inc. v. City of Long Beach* (1987) 197 Cal.App.3d 241, 256 [242 Cal.Rptr. 760]; accord, *Native Sun/Lyon Communities v. City of Escondido* (1993) 15 Cal.App.4th 892, 908 [19 Cal.Rptr.2d 344], questioned on another point in *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698 [107 Cal.Rptr.2d 149, 23 P.3d 43].)

### b. *Project Approval: Ultimate Determination of Feasibility*

■ When it comes time to decide on project approval, the public agency's decisionmaking body evaluates whether the alternatives are *actually* feasible. (*Mira Mar, supra,* 119 Cal.App.4th at p. 489; Guidelines, § 15091, subd. (a)(3).) While staff may draft the necessary findings, the decisionmaking body is responsible for the ultimate determination of feasibility, which cannot be delegated. (Guidelines, § 15025, subd. (b)(2); see *id.,* § 15091, subd. (a)(3).)

At this final stage of project approval, the agency considers whether "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report." (§ 21081, subd. (a)(3).) Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives.

### c. *Application to This Case*

 At this final stage of project approval, the agency considers whether "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report." (§ 21081, subd. (a)(3).) Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives.

### 2. *Appellants' Substantive Challenge to the City's Infeasibility Findings*

Appellants insist that the city council's reasons for finding the alternatives infeasible have "nothing to do with" the relevant factors listed in section 21081, subdivision (a)(3). Appellants thus contend that alternatives identified in the EIR were not "truly infeasible."

The City disagrees, asserting: "The City Council was legally justified in rejecting environmentally superior alternatives as 'infeasible' on the basis of its determination that the alternatives were undesirable from a policy standpoint because they failed to achieve what the Council regarded as primary objectives of the Master Plan." The City further asserts that substantial evidence supports its infeasibility findings.

We agree with the City on both counts.

a. *Permissible Considerations*

In finding the alternatives infeasible on policy grounds, the City relied on *Del Mar, supra*, 133 Cal.App.3d 401. In that case, the court concluded that the actions of respondent City of San Diego were "a rational accommodation of the social, economic and environmental interests with which the city must concern itself." (*Id.* at p. 404.) The court found that San Diego properly "considered and reasonably rejected the project alternatives suggested by Del Mar as infeasible in view of the social and economic realities in the region." (*Id.* at p. 417.) In doing so, the court stated, San Diego assessed the alternatives' feasibility, which "involves a balancing of various 'economic, environmental, social, and technological factors.' " (*Ibid.*, quoting § 21061.1 [statutory definition of "feasibility"].) As the court explained: "In this sense, 'feasibility' under CEQA encompasses 'desirability' to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors." (133 Cal.App.3d at p. 417.) The court therefore concluded "that San Diego did not abuse its discretion under CEQA in rejecting various project alternatives as infeasible." (*Ibid.*)

Here, the City's infeasibility findings likewise are based on policy considerations, particularly the City's interest in promoting transportation alternatives as well as access to its open space for persons with disabilities. Such policy considerations are permissible under the relevant statute, which calls for a determination that "economic, legal, *social*, technological, *or other considerations* . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report." (§ 21081, subd. (a)(3), italics added.) Under this authority, an alternative that "is impractical or undesirable from a policy standpoint" may be rejected as infeasible. (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 17.29, p. 824.) Additionally, an alternative "may be found infeasible on the ground it is inconsistent with the project objectives as long as the finding is supported by substantial evidence in the record." (*Id.*, § 17.30, p. 825.)

Appellants nevertheless attack the infeasibility determination in this case, asserting that the City "rejected the alternatives simply because they did not like them, not because they were truly infeasible." (Italics omitted.) As we see it, however, appellants' assertion represents nothing more than a "policy disagreement with the City." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1270 [15 Cal.Rptr.3d 176].) In making its infeasibility findings, the City determined "how the numerous competing and necessarily conflicting interests should be resolved." (*Del Mar, supra*, 133 Cal.App.3d at p. 407.) At bottom, appellants' disagreement is "with the nature of the balance struck between those interests." (*Ibid.*) This is not a case involving straightforward questions of legal or economic infeasibility. (See, e.g., *Uphold*

*Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 601 [54 Cal.Rptr.3d 366] [no economic infeasibility]; *id.* at p. 602 [no legal infeasibility].) Arguably, such cases may present brighter lines for judicial review. Whether or not that is so, this much is clear: it is wholly improper for us to "arrogate to ourselves a policy decision which is properly the mandate of the City." (*Defend the Bay v. City of Irvine*, at p. 1269.) In this case, the City's determination was consistent with permissible statutory factors. (§ 21081, subd. (a)(3) ["social . . . or other considerations"].) And it was justified under relevant case law, including *Del Mar, supra*, 133 Cal.App.3d 401.

Appellants question the continued validity of *Del Mar* following the decision in *Marina, supra*, 39 Cal.4th 341. As the high court stated there, "CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible." (*Id.* at pp. 368–369.) Appellants argue that this statement in *Marina* effectively overrules earlier precedent, including *Del Mar*. As appellants see it, *Marina* disapproves the "balancing" of statutory factors envisioned by that earlier case. (*Del Mar, supra*, 133 Cal.App.3d at p. 417.)

We reject appellants' reading of *Marina*. In our view, the quoted statement from that case simply recognizes the two distinct steps involved in approving a project with environmental impacts. The agency must first make a finding of infeasibility. (§ 21081, subd. (a); Guidelines, § 15091, subd. (a)(3).) This determination necessarily entails an evaluative process, since statutory "considerations" are involved. (§ 21081, subd. (a)(3).) In this first step, the positive and negative aspects of each alternative are evaluated. (*Concerned Citizens, supra*, 24 Cal.App.4th at p. 847.) This determination must be made before the agency can take up the question of overriding considerations. (§ 21081, subd. (b); Guidelines, § 15093.) Thus, unless and until the agency has taken the first step, it may not proceed to the second step, which *does* involve "weighing [environmental] effects against the project's benefits . . . ." (*Marina, supra*, 39 Cal.4th at p. 368.) The thrust of the quoted statement from *Marina* is to capture that distinction between the two steps in the process. That conclusion finds support in this passage from *Marina*: "If we agreed with the Trustees that mitigation were infeasible for the reasons given in the findings, . . . we would give much deference to the Trustees' weighing of the project's benefits against the remaining environmental effects." (*Ibid.*) It is also noteworthy that the court expressly permitted the Trustees to revisit their determination and to find "mitigation to be infeasible for reasons other than those . . . rejected." (*Id.* at p. 369.) In sum, nothing in *Marina* casts doubt on the continuing vitality of *Del Mar*.

Nor are we persuaded by appellants' attempts to distinguish *Del Mar, supra*, 133 Cal.App.3d 401. In appellants' words: "Arguably, in *Del Mar* there was no alternative to the City's 'desire' to grow to accommodate housing for the region. *Del Mar*, at 416–417. In the case at bar, however, the Respondents' desire for an east-west bike connection and ADA compliant paths can be accommodated by altering trail alignments." Appellants' proffered basis for distinction is nonexistent. As stated in *Del Mar*, the subject approvals were challenged on the very ground that "San Diego failed to implement *feasible mitigation measures and alternatives* which would have reduced the adverse environmental impacts of the project." (*Del Mar*, at p. 416, italics added.) There, as here, the challenger was claiming that feasible alternatives existed. We thus find no basis for distinguishing the *Del Mar* case, which constitutes persuasive legal authority in support of the City's determinations.

 In sum, we conclude, the City relied on appropriate considerations in determining that the alternatives analyzed in the EIR were infeasible.

### b. *Substantial Evidence*

Appellants mount no direct attack on the evidentiary basis for the feasibility findings. Instead, their bid for reversal is based solely on the assertion that the alternatives were not truly infeasible. As they put it: "There was no legal or economic infeasibility. It was simply a preference." Again, this is nothing more than a "policy disagreement with the City." (*Defend the Bay, supra*, 119 Cal.App.4th at p. 1270.) But that disagreement is "not one which in any way demonstrates a lack of evidentiary support for the City's conclusions." (*Id.* at p. 1271.)

In any event, substantial evidence supports the City's infeasibility findings. Evidence for such findings may be contained anywhere in the administrative record. (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1401.) The extensive record in this case reflects careful consideration of the alternatives' feasibility, with the City's policy choices backed by substantial evidence. The ultimate decision to proceed with the project "is a discretionary one, and will be upheld so long as it is based upon findings supported by" substantial evidence. (*Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 684 [246 Cal.Rptr. 317].) Under that standard, and on this record, the City's decision must be upheld.

## DISPOSITION

The judgment of the superior court is affirmed.

Duffy, J., concurred.

**MIHARA, Acting P. J.,** Concurring.—Although I agree with the result reached in the majority opinion, I write separately to explain why I find appellants' contentions unavailing.

## I. Background

Arana Gulch is a parcel of more than 60 acres of real property owned by the City of Santa Cruz (the City). The project proposed by the City is the Arana Gulch Master Plan (the Plan). The Plan is designed to serve two sets of key objectives. The City wants to protect the natural resources and sensitive habitat in Arana Gulch while providing a high level of public access that will permit the City to educate not only pedestrian visitors but also disabled visitors about resource protection through interpretive displays and programs. To provide the highest level of public access to Arana Gulch, the Plan proposes the creation of a trail system that will include a multiuse, paved, ADA-compliant,[1] east-west through trail that will connect the adjacent communities and allow for pedestrian, wheelchair, and bicycle access.

The City's environmental impact report (EIR) for the Plan concludes that the proposed multiuse trail could have a significant impact on biological resources, as it would pass through an area that possibly contains a seed bank for the Santa Cruz tarplant. The EIR identifies four possible alternatives to the proposed multiuse trail that might reduce or eliminate the Plan's significant impacts. Alternative 1 is no project, and it would accomplish none of the project objectives. Alternative 2 is similar to the proposed project, but the multiuse trail would not travel through the Port District property, thereby providing a reduced level of public access. Alternative 2 *would not* reduce the impact of the proposed project on the Santa Cruz tarplant. Alternative 3 is similar to the proposed project, but the east-west through trail would be unpaved, thereby precluding access for the disabled. Alternative 3 *would* reduce the impact of the proposed project on the Santa Cruz tarplant, and it was identified in the EIR as the environmentally superior alternative. Alternative 4 would provide for a trail system, but there would be no paved trails and no east-west connector trail. Alternative 4 would preclude access for the disabled and provide a reduced level of public access for the nondisabled.

The city council certified the EIR, and it rejected the four alternatives identified in the EIR on the grounds that none of the alternatives would satisfy all of the "key objective[s]" of the project.

## II. Discussion

" 'We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. "Our

---

[1] ADA stands for the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.).

limited function is consistent with the principle that '[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " . . . We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.' " (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1350 [46 Cal.Rptr.3d 902] (*Preservation Action Council*).)

"Judicial review of an agency's decision to certify an EIR and approve a project 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.] Thus, we consider only whether the City failed to comply with CEQA or made determinations that were not supported by substantial evidence." (*Preservation Action Council, supra*, 141 Cal.App.4th at p. 1352.)

### A. Reasonable Range of Alternatives

Appellants contend that the EIR failed to set forth a reasonable range of alternatives because none of the alternatives fully satisfied the City's "key objective[s]," which included providing an ADA-compliant trail. In appellants' view, the failure of the EIR to include an alternative that met *all* of the City's "key objective[s]" "created a false choice between an ADA trail and avoiding significant impacts to tarplant."

" 'CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project*, which: (1) offer substantial environmental advantages over the project proposal (Pub. Resources Code, § 21002); and (2) may be "feasibly accomplished in a successful manner" considering the economic, environmental, social and technological factors involved.' " (*Preservation Action Council, supra*, 141 Cal.App.4th at p. 1350.)

Appellants' contention lacks merit. First, although appellants claim that the EIR does not include an alternative that provides for an ADA-compliant trail, alternative 2 in fact provides for an ADA-compliant trail. Second, CEQA (Cal. Environmental Quality Act; Pub. Resources Code, § 21000 et seq.) neither explicitly nor implicitly requires that an EIR identify a single

alternative that meets *all* of the project's key objectives *and* is environmentally superior. Indeed, it may be impossible to identify such an alternative to a project where the circumstances dictate that the key objectives cannot be met without some significant environmental impact. Appellants do not point to anything in the administrative record which indicates that an environmentally superior alternative *exists* that would satisfy *all* of the Plan's key objectives. Finally, the EIR did not "create a false choice" between disabled access and environmental impact on the Santa Cruz tarplant. By discussing a range of alternatives which included alternatives that met some of the Plan's key objectives with reduced environmental impact, the EIR presented the city council with a reasonable range of choices that allowed the city council to weigh the importance of each of the Plan's key objectives against the environmental impact associated with those objectives. CEQA does not require more of the EIR's range of alternatives.

Appellants also argue that the City was required to consider *offsite* alternatives for an east-west bike path, and they imply that the EIR was required to contain a discussion of such alternatives. The administrative record demonstrates that the City has over many years considered a number of possible offsite routes for an east-west bike path. Appellants ignore the fact that the project under consideration by the City here was not an east-west bike path but a master plan for Arana Gulch. While an offsite route for the bike path might have eliminated the need for a bike path through Arana Gulch, it would not have changed the need for disabled access or the City's desire to provide the highest level of public access to Arana Gulch by providing an east-west through connector trail. Some of the alternatives considered in the EIR would have omitted an east-west connector through Arana Gulch. Had one of those alternatives been selected, any east-west bike path would necessarily have had to be offsite. Under these circumstances, the EIR provided sufficient information to the public about alternatives to avoid the environmental consequences of the Plan, and the administrative record provided ample information to inform the City's legislative decision regarding the relative importance of the bike path objective of the Plan.

## B. Feasibility of Alternatives

Appellants contend that the City's findings that the alternatives were not feasible were erroneous because they were inconsistent with the EIR's inclusion of these alternatives as potentially feasible alternatives.

An EIR "must consider a reasonable range of *potentially feasible alternatives* that will foster informed decisionmaking and public participation." (Cal. Code Regs., tit. 14, § 15126.6, subd. (a), italics added (CEQA Guidelines); see *Preservation Action Council, supra,* 141 Cal.App.4th at pp. 1350–1351.)

When the legislative body certifies the EIR, it has made a determination that the EIR contains the required consideration of *potentially feasible* alternatives. After the certification of the EIR, the legislative body makes a separate determination whether "[s]pecific economic, legal, social, technological, or other considerations . . . *make infeasible* the mitigation measures or alternatives identified in the environmental impact report" and whether "specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (Pub. Resources Code, § 21081, subds. (a)(3), (b), italics added.)

Thus, while the certification of the EIR is a determination that the EIR adequately discusses *potentially feasible* alternatives, CEQA explicitly permits the legislative body to make a postcertification determination that these potentially feasible alternatives are *not actually feasible*, so long as the legislative body makes the requisite findings citing specific reasons for its infeasibility determination. There is no inconsistency between the City's certification of an EIR that discusses potentially feasible alternatives and the City's determination that those alternatives are not actually feasible.

Appellants argue that the City based its infeasibility determination on *impermissible considerations*. This argument falters on the fact that CEQA expressly permits such a determination to be based on "other considerations" (Pub. Resources Code, § 21081, subd. (a)(3)), and we review the City's determination solely for substantial evidence to support those considerations (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 596 [54 Cal.Rptr.3d 366]). Here, the record contains substantial evidence to support the City's determination that the alternatives were infeasible because they would fail to satisfy the Plan's key objectives. None of the alternatives would provide a trail that could not only be accessed by the disabled, but would also provide an east-west connector that would ensure the highest level of public access to Arana Gulch and complete a bicycle corridor that would encourage alternative transportation. The City's desire to fulfill the Plan's key objectives could not possibly be deemed an *impermissible* consideration, and it plainly fell within CEQA's authorization that an infeasibility finding may be based on "other considerations."

CEQA did not require the City to choose the environmentally superior alternative. It simply required the City to *consider* environmentally superior alternatives, *explain* the considerations that led it to conclude that those alternatives were infeasible, *weigh* those considerations against the environmental harm that the Plan would cause, and *make findings* that the benefits of those considerations outweighed the harm. Here, the City considered environmentally superior alternatives, explained the considerations that led it to conclude that those alternatives were infeasible, weighed those

considerations against the environmental impact of the Plan, and made findings that these considerations outweighed the environmental impact. The City fully complied with CEQA.

### III. Conclusion

I agree that the judgment should be affirmed.

A petition for a rehearing was denied October 14, 2009, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied December 17, 2009, S177419.