Filed 11/29/22 Save Our Glendale v. City of Glendale CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SAVE OUR GLENDALE, | B308034 |
| Petitioner and Appellant, | (Los Angeles County Super. Ct. No. BS174805) |
| v. | |
| CITY OF GLENDALE et al., | |
| Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard L. Fruin, Jr., Judge. Affirmed.

Naira Soghbatyan for Petitioner and Appellant.

Michael J. Garcia, City Attorney, Gillian Van Muyden, Chief Assistant City Attorney, and Yvette Neukian, Deputy City Attorney, for Respondents.

———————————————

Petitioner and appellant Save Our Glendale (petitioner) seeks to overturn the trial court's decision upholding the City of Glendale's (City) certification of a final program environmental impact report (Program EIR) for the South Glendale Community Plan (the Community Plan). Petitioner also seeks to overturn the trial court's decision upholding City approval of a portion of the Community Plan and related implementation actions. And, petitioner seeks to overturn the trial court's rejection of its subsequent challenges to City approval of a citywide inclusionary zoning ordinance and amendments to the City's 2006 Downtown Specific Plan (the Downtown Plan). Finally, petitioner challenges the trial court's award of costs to respondents.[1]

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Community Plan and Program EIR*

The Community Plan is a community planning-level document designed to guide development in southern Glendale over the next 25 years. The Community Plan Program EIR was certified, and portions of the Community Plan and implementing actions were approved on July 31, 2018. Planning efforts began in 2011 and included extensive public involvement in surveys and questionnaires, vision boards, study sessions, community meetings, workshops and road shows, extensive Web site information, research, a scoping meeting, a 60-day Program EIR comment period, and 26 public meetings/hearings over a six-year

---

[1] Respondents below and on appeal include the City, the City of Glendale Council, and the City of Glendale Community Planning Department. We refer to the three respondents collectively as the City.

period.  The City's planning efforts were supported in part through a competitive grant from the Los Angeles County Metropolitan Transportation Authority that the City used to prepare a smaller transit-oriented design plan for the Tropico area of the City and which later folded into the broader Community Plan.

The Program EIR was prepared as a program-level EIR. (Cal. Code Regs., tit. 14, §§ 15146, 15152, subd. (b).)  The City published the Program EIR notice of preparation on September 7, 2016, and published notice of availability on January 11, 2018.  A draft Program EIR was circulated 60 days for public comment, and on July 31, 2018, the City took the following actions: (1) Certified the Program EIR and adopted a statement of overriding considerations and mitigation monitoring and reporting program; (2) Adopted an environmentally superior alternative for Tropico; (3) Authorized the initiation of the transit plan for Tropico; (4) Directed maintenance of current zoning densities in other Community Plan centers and corridors; (5) Directed staff to hold study sessions to review the mixed-use designations for those centers and corridors; (6) Directed staff to implement the Community Plan's "Road's End Neighborhood" as single family residential and maintain residential densities in the Community Plan's area; (7) Directed staff to modify the land use element map and text amendments necessary for Tropico so that it matched the Community Plan; and (8) Introduced an ordinance downzoning six C3 District III lots within the Community Plan.

On August 14, 2018, the City adopted the C3 downsizing ordinance and filed the Program EIR Notice of Determination.

3

*Downtown Plan*

The Downtown Plan is an existing specific plan within the larger Community Plan area for which the City had certified a program EIR in 2006. The Community Plan treated the Downtown Plan as a stand-alone plan governed by its own standards.

On March 27, 2018, the City imposed a moratorium on new residential development in the Downtown Plan in order to study potential modifications to design standards and incentives.

As the parties agree, amendments to the Downtown Plan were subsequently approved, and the City adopted a citywide inclusionary zoning ordinance.

*Original Petition for Writ of Mandate*

On August 30, 2018, petitioner filed its original verified petition for writ of mandate and complaint challenging the City's July 31, 2018, certification of the Community Plan Program EIR and project approvals. The notice of intent filed with that petition did not refer to any commencement of an action challenging the subsequently approved Downtown Plan amendments or adoption of the citywide inclusionary zoning ordinance.

On August 30, 2018, and then again on December 18, 2018, in accordance with Public Resources Code section 21167.6, subdivision (b)(2),[2] petitioner filed notices of election to prepare the administrative record.

---

[2] Public Resources Code section 21167.6, subdivision (a), provides, in relevant part: "At the time that the action or proceeding is filed, the plaintiff or petitioner shall file a request that the respondent public agency prepare the record."

4

*Trial Court Transfers Record Preparation to the City*

Beginning in the fall of 2018 and continuing to June 2019, the City exchanged correspondence with petitioner concerning record preparation. But petitioner could not complete the record. Thus, after the trial was continued, the City filed a motion seeking an order directing petitioner to correct and supplement the administrative record, or in the alternative, for an order authorizing respondents to complete preparation of the administration record so it can be certified, and ordering payment of respondents' costs of preparation.

At the August 7, 2019, hearing on the City's motion, the trial court discussed the state of the administrative record with counsel. The trial court asked counsel to "talk" and "finalize" the index for the record. The City's counsel represented that they had prepared a "modified index" and that the parties were about "90 percent plus there," but it was still incomplete. Counsel asked the trial court if it wanted "respondents to complete that AR index." The trial court responded by asking counsel if she was "willing to prepare it at no cost to the petitioner." Counsel replied: "Well, we would like to recover the cost that we put out so far, but the additional cost, I think we're willing to forgo that."

Ultimately, the trial court transferred preparation of the record to respondents, reasoning: "[T]he administrative record to

Alternatively, the petitioner may "elect to prepare the record of proceedings . . . subject to certification of its accuracy by the public agency within the time limit specified in this subdivision [60 days from the date of the request]." (Pub. Res. Code, § 21167.6, subd. (b)(2).)

All further statutory references are to the Public Resources Code unless otherwise indicated.

date has not been prepared timely, and I'm not casting any criticism. I'm just saying it hasn't been done. I need to get it done to keep the present trial date." In so ruling, the trial court pointed out to petitioner that respondents "agreed to assume the expense of getting this across the goal line, and I think that's a pretty good deal for you."

Later in the hearing, the City's counsel stated: "We're still going to make a motion for those costs. We're entitled to under the law." The trial court and counsel then discussed who would assume the cost of copying the administrative record. When the trial court asked if it was "normally the petitioner," the City replied, "Correct, the petitioner's expense." The trial court then asked petitioner's counsel if she wanted to assume that expense. Before she could reply, the trial court urged the parties to discuss it; no ruling on costs was made.

In sum, as reflected in the trial court's final statement of decision filed July 21, 2020, on August 7, 2019, the trial court "granted the City's alternate motion and ordered the City to finish the preparation of the [record]."

At a subsequent hearing on August 14, 2019, the City represented that the administrative record would be "ready" by August 26, 2019.

*First Amended Petition for Writ of Mandate*

Unbeknownst to the City or the trial court,[3] petitioner was preparing a first amended petition for writ of mandate. In fact,

---

[3] The trial court was understandably frustrated with petitioner's counsel's lack of communication and conduct in connection with this filing. The trial court's frustration continued throughout these proceedings.

6

on August 26, 2019, the date when the City certified the administrative record, petitioner filed a first amended verified petition for writ of mandate and complaint (the amended petition). As noted by the trial court, the amended petition "massively expanded the allegations" made in the original petition—it is "84 pages long, has 383 paragraphs and pleads 22 causes of action," including "CEQA causes of action against projects that were not challenged in the" original petition. Notably, the amended petition challenged the Downtown Plan amendments and citywide inclusionary zoning ordinance, both of which the City approved after the original petition was filed (New CEQA Claims).

Petitioner neither asked the City to prepare the record for the New CEQA Claims nor gave notice that it was electing to prepare the record for those claims. (§ 21167.6.)

*Petitioner's First Brief on the Amended Petition*

On October 18, 2019, petitioner filed its opening brief. In response, the City filed an ex parte application, asking the trial court to double the page limit for its opposition or strike the opening brief. After hearings on October 29 and November 1, 2019, the trial court struck petitioner's opening brief "for a variety of reasons" and ordered a rewrite.

The matter was set for trial beginning January 17, 2020.

*Petitioner's Second Brief on the Amended Petition; City's Motion to Supplement and for Costs*

On November 15, 2019, petitioner filed its second opening brief. Shortly thereafter, it filed requests for judicial notice and a motion to augment the record.[4]

On December 19, 2019, the City filed its opposition to petitioner's second opening brief, motion to augment, and requests for judicial notice. It also filed a motion to supplement the record and for costs.

On January 6, 2020, petitioner filed its opposition to the City's motion to supplement and for costs.

*Lodging of the Record*

On January 9, 2020, the City lodged the certified record and its own joint appendix. The following day, petitioner lodged its joint appendix.

*Hearing on Motion to Supplement/Costs*

On January 31, 2020, the trial court mostly granted the City's motion to supplement/costs, but deferred ruling on costs.

*Trial and Judgment*

From February 14, 2020, through June 22, 2020, the trial court held a series of hearings on pretrial motions. Ultimately, on July 21, 2020, it issued its 60-page statement of decision, finding for the City on all issues and claims.

As is relevant to issues raised in this appeal, the trial court denied petitioner's motion to augment the record (except for one document) and the requests for judicial notice (except for one

---

[4] As the trial court pointed out, part of the motion to augment contained 150 categories of documents, exceeding 10,000 pages.

8

exhibit). It then dismissed petitioner's New CEQA Claims for failure to comply with section 21167.6's mandate regarding preparation of the administrative record.

On the merits, and pursuant to the Public Resources Code and the Guidelines for the Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 *et seq*. (Guidelines)), the trial court found petitioner's claims against the EIR and the City's approvals of the Community Plan unmeritorious.

The trial court also awarded the City its costs as prevailing party.

*Memorandum of Costs; Motion to Tax Costs*

On August 5, 2020, the City filed a memorandum of costs, seeking $15,924.99. In response, petitioner filed a motion to tax costs. It argued, inter alia, that the trial court only "'provisionally' transferred" record preparation to the City, and did so "relying on [the] City's consent to bear AR preparation costs."

The City opposed petitioner's motion to tax, noting that (1) the trial court deferred ruling on the costs for preparing the administrative record until after trial, and (2) "Although the Court asked [the] City to consider foregoing record preparation costs, *at no time* did [the] City waive its request for costs and has repeatedly preserved its right to request such costs."

Ultimately, the trial court awarded the City $14,578.34 in costs.

*Appeal*

Petitioner's timely appeal ensued.

**DISCUSSION**

I. *Trial court properly dismissed petitioner's New CEQA claims*

Before we address petitioner's challenges to the EIR, we first consider petitioner's objections to procedural rulings by the trial court. These rulings frame the scope of the issues on appeal.

As set forth above, petitioner filed its amended petition with the new claims on the same day that the City filed its record certification and answer to petitioner's original petition. As the trial court aptly noted, these new claims related to the City's adoption of the Downtown Plan amendments and the citywide inclusionary zoning ordinance. The Downtown Plan amendments and inclusionary zoning ordinance are separate projects adopted after the Community Plan Program EIR was certified. As such, they are unrelated to the Community Plan.

Petitioner never elected to prepare a record or requested that the City prepare a record for the New CEQA Claims when it filed its amended petition. Instead, it filed "unauthorized motions to augment the record with extra record evidence numbering more than 10,000 pages . . . three weeks after it filed its initial brief." Because petitioner failed to follow section 21167.6's mandatory procedures, petitioner had no certified record for its New CEQA Claims.[5]

*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 (*Western States*) does not compel a different result.

---

[5] It follows that the trial court properly denied petitioner's motion to augment the record and requests for judicial notice. For the same reasons, we do not consider "the *augmented* record presented to the lower court through Petitioner/Appellant's Motion to Augment, which the lower court denied." We accordingly deny petitioner's request for judicial notice on appeal.

10

In *Western States*, our Supreme Court reaffirmed "that extra-record evidence is generally not admissible in non-CEQA traditional mandamus actions challenging quasi-legislative administrative decisions." (*Western States*, *supra*, at p. 574.) It went on to extend that principle to CEQA actions. (*Ibid*. ["there is no sound reason why CEQA and non-CEQA cases should be governed by different evidentiary rules"].)

That said, our high court recognized "several limited exceptions to the general rule excluding extra-record evidence." (*Western States*, *supra*, 9 Cal.4th at p. 575, fn. 5.) Petitioner has not demonstrated how any of those exceptions applies here.

Absent an administrative record of evidence to support petitioner's allegations, the New CEQA Claims were properly dismissed.[6]

---

[6] During oral argument, petitioner's counsel asserted that the City had stipulated to an augmented record. We have carefully reviewed the portions of the reporter's transcript and clerk's transcript cited by counsel and see no such unconditional stipulation. In fact, the identified pages of the clerk's transcript are to the City's *opposition* to the motion to augment. And, while the City may have stipulated to including *some* of the documents, it did object to petitioner's "organization, labeling, order and inappropriate separation of the documents from their logical groupings." Thus, the City only agreed to part of the "requested augmentation *pending proper reorganization*." There is no indication that the proper reorganization ever was completed. Moreover, the City also indicated that it was preserving general objections to these documents. At the hearing in the trial court on the motion to augment, the City echoed its objection that a motion to augment is not "the proper process," which is partially why it was opposing the motion. Regardless, as set forth below, the trial court alternately dismissed the New CEQA Claims on

11

Alternatively, the trial court properly dismissed petitioner's New CEQA Claims on the grounds that petitioner pled inconsistent allegations concerning these claims in its amended petition. It is well-settled that "[a] plaintiff may plead inconsistent counts or causes of action in a verified complaint, but this rule does not entitle a party to describe the same transaction as including contradictory or antagonistic facts." (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1381.)

Here, the amended petition alleges that the DSP and IZO were separate independent projects and that they were part of, but severed from, the Community Plan. As the trial court aptly noted, these allegations are inherently inconsistent. As such, they are improper.

In light of these determinations, we need not address petitioner's remaining arguments concerning its New CEQA Claims.

II. *Environmental protection under CEQA*

"'The Supreme Court has repeatedly observed that the Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.] To further that purpose, 'CEQA contains a "substantive mandate" requiring public agencies to refrain from approving projects with significant environmental effects if "there are *feasible* alternatives or *mitigation measures*" that can substantially lessen or avoid those

the grounds that they were inconsistent with other allegations pled in the amended petition. Petitioner did not address this point during oral argument.

effects.' [Citation.] CEQA nevertheless 'permits government agencies to approve projects that have an environmentally deleterious effect, but [it] also require them to justify those choices in light of specific social or economic conditions.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 978 (*Native Plant*).)

"The 'heart of CEQA' is the EIR. [Citations.] 'The EIR, with all its specificity and complexity, is the mechanism prescribed by CEQA to force informed decision making and to expose the decision making process to public scrutiny.' [Citation.] The requirements governing EIR's are set forth in the statute and in the CEQA guidelines." (*Native Plant, supra,* 177 Cal.App.4th at pp. 978–979.)

III. *Standards of review*

"Under CEQA, courts review quasi-legislative agency decisions for an abuse of discretion. [Citation.] At both the trial and appellate level, the court examines the administrative record anew. [Citation.]" (*Native Plant, supra,* 177 Cal.App.4th at p. 984.)

"An 'agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.' [Citation.] 'Judicial review of these two types of error differs significantly . . .' however. [Citation.]" (*Native Plant, supra,* 177 Cal.App.4th at p. 982.) For that reason, "[i]n evaluating an EIR for CEQA compliance . . . , a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412,

13

435.) "Whether an 'agency has employed the correct procedures,' is reviewed 'de novo . . . "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation] . . . .' [Citation.] But an 'agency's substantive factual conclusions' are 'accord[ed] greater deference.' [Citation.] 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." [Citation.]' [Citation.]" (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 531.)

IV. *Trial court properly found that the Community Plan involved a program EIR*

Petitioner argues that the trial court erred in finding that the Community Plan involved a "community" plan and a "program" EIR, obviating the need for EIR-specificity or CEQA challenges because later physical projects would have their own environmental review. We are not convinced.

A. Relevant law

"A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project." (Guidelines, § 15168, subd. (a).) Section 15168, subdivision (a)(3) specifically authorizes the use of the program EIR for the issuance of "plans."

To qualify as a program, the actions must be related either geographically, as logical parts in a chain of actions, in connection with the issuance of plans to govern the conduct of the continuing program, or "[a]s individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be

14

mitigated in similar ways." (Guidelines, § 15168, subd. (a)(3).) As the trial court correctly noted, "[a]n EIR for a 'local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow.'" (Guidelines, §§ 15146, subd. (b), 15152, subd. (b).) In other words, "a 'program EIR' evaluates the broad policy direction of a planning document, such as a general plan, but does not examine the potential site-specific impacts of the many individual projects that may be proposed in the future consistent with the plan. [Citations.] Program EIRs play a key role in a 'tiered' CEQA analysis." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1047.)

In contrast, a project EIR "is prepared for a construction-level project, and 'should focus primarily on the changes in the environment that would result from the development project [and] examine all phases of the project including planning, construction, and operation.' [Citations.]" (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco*, *supra*, 247 Cal.App.4th at p. 1047 [citing Guidelines, § 15161].)

B. Analysis

Here, as the trial court found, the Community Plan is described as the adoption of the second in a series of four community plans, involving amendments to the General Plan and zoning ordinance, which together constitute a series of actions related geographically as logical parts in a chain of actions, and individual activities having generally similar environmental effects—the very definition of a program EIR. In fact, the program EIR provides that the Community Plan is "intended to

15

act as an analytical superstructure for subsequent, more detailed analyses associated with individual discretionary project applications consistent with the proposed" Community Plan. (Fn. omitted.) The fact that future environmental review may qualify for exemptions and streamlining is not foreclosure of further CEQA review/mitigation. In fact, the Program EIR commits the City to subsequent review pursuant to CEQA guidelines for tiering from a program EIR.

The cases cited by petitioner are inapposite because they do not address program versus project-level EIRs; rather, they concern whether an EIR needed to be prepared in the first instance. (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 410; *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 281.)

Petitioner further challenges the trial court's determination on the grounds that its reliance upon tiering of future projects was erroneous. We disagree.

Tiering uses "analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project." (Guidelines, § 15152, subd. (a).) Tiering is encouraged to "eliminate repetitive discussions of the same issues and focus the later EIR or negative declaration on the actual issues ripe for decision at each level of environmental review." (Guidelines, § 15152, subd. (b).) Thus, despite petitioner's argument to the contrary, tiering under section 15152 does not require later environmental review, whether by subsequent EIR

16

or negative declaration, to "cure . . . inadequacies" or reduce impacts, particularly those already analyzed and determined to be incapable of mitigation.

In light of the foregoing, we reject petitioner's contention that the trial court improperly upheld project description, premature notice of determination, baseline, alternatives, failed or deferred mitigation, and nonconcurrent adoption and study of general plan land use, circulation, and environmental justice elements.

V. *EIR baseline was not flawed*

Petitioner argues that the judgment must be reversed because the EIR baseline for the program EIR was flawed. According to petitioner, the EIR's projected baseline is not supported by substantial evidence.

A. <u>Relevant law</u>

An accurate baseline is fundamental for an EIR; without it, the "analysis of impacts, mitigation measures and project alternatives becomes impossible." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 953.)

CEQA mandates that the baseline be based upon physical environmental conditions as they exist at the time the notice of preparation is filed. (Guidelines, § 15125, subd. (a)(1).) While CEQA allows projected baselines of future conditions where the existing circumstances are subject to change, it mandates that "[u]se of projected future conditions as the only baseline must be supported by reliable projections based on substantial evidence in the record." (Guidelines, § 15125, subd. (a)(2).)

B. <u>Analysis</u>

The program EIR population and housing baseline is supported by ample evidence: data relied upon is sourced and the

17

baseline settings are explained and supported. Specifically, the program EIR relies upon U.S. Census data, the Southern California Association of Governments's 2017 profile of the City of Glendale, the Housing Element, and the City's habitable dwelling unit data to establish a population and housing baseline and to calculate population based on the average persons per household.

Furthermore, the summary of the project, local and regional conditions, and forecasted growth in the program EIR are also supported by substantial evidence.[7]

VI. *Community Plan did not violate the planning and zoning laws*

Petitioner argues that the Community Plan violated the planning and zoning laws. It points us to two claimed errors: (1) internal GP inconsistency, and (2) nonconcurrent adoption of the environmental justice element. We address each in turn.

A. Internal inconsistency

Government Code section 65300.5 provides, in relevant part: "Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." According to petitioner, the Community Plan is inconsistent and therefore improper pursuant to this statute.

Petitioner's reliance upon Government Code section 65300.5 is misplaced. As the trial court correctly found, on July 31, 2018, when the City certified the Program EIR and

---

[7]    Because the baseline is not flawed, it follows that we reject petitioner's contention that all of the EIR's alternatives are unreasonable.

18

approved Alternative 2, Glendale, a charter city, was not subject to either Government Code section 65300.5 or 65359, which impose general plan consistency requirements on general law cities. Thus, as a matter of law, petitioner's claim is rejected.

Setting that aside, petitioner offers no evidence that the Community Plan resulted in inconsistencies. And, as the trial court aptly noted, "[t]he [Community Plan] is not implemented yet. Amendments to insure consistency with the general plan will be made before the [Community Plan] is implemented." Since the Community Plan amendments have yet to be adopted, petitioner's claim of inconsistency is premature.

B. Environmental justice

Government Code section 65302, subdivision (h)(2), requires a city or county to "adopt or review the environmental justice element, or the environmental justice goal, policies, and objectives in other elements, upon the adoption or next revision of two or more elements concurrently on or after January 1, 2018." Petitioner contends that the Community Plan approvals adopted and/or amended two elements of the City's general plan, thereby requiring the City to adopt an environmental justice element. Petitioner is mistaken.

The Community Plan implementation section explicitly refers to later implementation actions that will include the adoption of environmental justice policies to satisfy Government Code section 65302, subdivision (h)(2). The mere mention of these two elements for later amendment does not immediately trigger Government Code section 65302, subdivision (h)(2), compliance.

19

VII. *Impacts and mitigation measures are identified*

Petitioner asserts that the City "fail[ed] to mitigate impacts" and "omit[ted] cumulative impacts" and that these alleged omissions violate CEQA's information mandates.

Mitigation measures are actions that are intended to avoid, minimize, rectify, or eliminate any significate adverse impact of a project. (Guidelines, §§ 15370, 15126.4, subd. (a)(1).) Enforcement of such measures is ensured through the adoption of a required mitigation monitoring and reporting requirement. (§ 21081.6.)

For the reasons outlined by the trial court, we disagree. The EIR discusses the environmental impacts of the Community Plan project and the mitigation measures for those impacts and whether, after the application of the mitigation measures, the environmental impacts will remain significant.

VIII. *Notice of Determination*

As it did in the trial court, petitioner asserts that the Notice of Determination was prejudicially premature. But, as it also did in the trial court, petitioner relies upon exhibits not received into evidence. Because this argument is not based upon admitted evidence, it fails.

IX. *Failure to recirculate the EIR*

Petitioner argues that the City violated CEQA by failing to recirculate the EIR to reflect new significant information. Respondents do not address this argument in their respondents' brief.

"'If significant new information is added to an EIR [or to the administrative record], the lead agency must issue a new notice and recirculate the EIR for comments and consultation.' [Citations.]" (*Gray v. County of Madera* (2008) 167 Cal.App.4th

20

1099, 1120.)  According to petitioner, the new significant information includes the "DSP Moratorium" and the fact that the City realized its Community Plan was inconsistent.  These claims fail.

Petitioner's claim concerning the "DSP Moratorium" is one of the New CEQA Claims properly dismissed by the trial court.  While the original petition for writ of mandate set forth one paragraph concerning the DSP Moratorium, no allegations arose from it.  Those allegations did not appear until the first amended petition.

And, as discussed above, the Community Plan is not inconsistent.

X.  *Costs*

A.  Standard of review

We review the trial court's cost award for abuse of discretion.  (*El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc.* (2007) 150 Cal.App.4th 612, 617.)

B.  Relevant law

"[A] prevailing party is entitled as a matter of right to recover costs in any action or proceeding."  (Code Civ. Proc., § 1032, subd. (b).)  The statutes governing the award of costs create three categories of costs:  (1) those specifically enumerated as "allowable" (Code Civ. Proc., § 1033.5, subd. (a) (section 1033.5));  (2) those specifically enumerated as "not allowable . . . except when expressly authorized by law" (§ 1033.5, subd. (b));  and (3) those "not mentioned" in the statutes, which are recoverable "in the court's discretion" (§ 1033.5, subd. (c)(4)).  (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 71.)  Any costs awarded must be "reasonably necessary to the

conduct of the litigation" and "reasonable in amount."  (§ 1033.5, subds. (c)(2) & (3).)

Courts employ a burden-shifting analysis.  The prevailing party bears the initial burden of establishing prima facie entitlement to the recovery of costs, which it meets if its verified cost bill "'appears proper on its face.'"  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 855; *Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.)  The nonprevailing party then bears the burden of making a "proper[] object[ion]" to specific costs in a motion to tax.  (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1265.)

C.  <u>Analysis</u>

Applying these legal principles, we conclude that the trial court properly awarded respondents their costs.

1.  *Filing fees*

Section 1033.5, subdivision (a)(14), allows a prevailing party to recover costs for "[f]ees for the electronic filing or service of documents through an electronic filing service provider if a court requires or orders electronic filing or service of documents."  Furthermore, courier and messenger charges related to trial preparation and incurred for such matters as filing documents with the court, complying with document demands, and transporting exhibits to and from the courtroom may also be reimbursable costs.  (See, e.g., *Ladas v. California State Auto. Assn., supra*, 19 Cal.App.4th at p. 776; *Benach v. County of Los Angeles, supra*, 149 Cal.App.4th at pp. 857–858.)

Here, the trial court required pick-up and delivery of the record and related documents, and requested service of courtesy copies.  Thus, the trial court's award of costs for these services was well within the trial court's discretion.

On appeal, petitioner asks us to reverse the cost award on the grounds that the cost breakdown of e-filing and e-service fees "significantly *differed*" between the City's memorandum of costs and its opposition to petitioner's motion to tax costs. We are not convinced. While the description of those charges may be different, the total charges are the same.

2. *Costs of hearing transcripts*

Petitioner further argues that the trial court erred in awarding respondents costs for 10 transcripts.

Section 1033.5, subdivision (a)(9), allows for the recovery of costs for "[t]ranscripts of court proceedings ordered by the court." (See also § 1033.5, subd. (c)(4) [certain items may be allowed in the court's discretion].)

The trial court acted well within its discretion when it determined that the City needed all of the hearing transcripts to fairly conduct this litigation. Petitioner referenced incomplete transcripts in various motions and declarations. As the trial court aptly noted, this case was unnecessarily contentious and complicated, partially because of petitioner's mischaracterizations. For example, petitioner repeatedly insisted that the City agreed to pay record preparation costs and that the trial court did not transfer record preparation to the City. Petitioner is wrong. As set forth above, when petitioner could not timely prepare the record, the trial court ordered the City to do so. And, while the City was initially "willing to consider" forgoing some costs, it never agreed to do so; in fact, it expressly reserved its right to request costs. Despite these clear facts, petitioner continues to misrepresent what occurred, confirming why hearing transcripts were critical to ensure fairness, integrity, and accuracy in these proceedings. (§ 1033.5, subd. (c)(4).)

In so finding, we reject petitioner's assertion that it would be inequitable to award these costs to respondents because petitioner already paid for "transcript/reporter costs." Petitioner chose to transcribe all of the hearings, and the City paid for its copy of the transcripts it needed to conduct the litigation. The City was not required to share in petitioner's transcript costs.

That said, on March 6, 2020, the trial court asked for the February 28, 2020, and March 6, 2020, transcripts in order to review the matter under submission. On March 23, 2020, petitioner asked the City to share the cost of providing the transcripts required by the court, and the City agreed to the March 6, 2020, transcript only. Thus, respondents rightly agreed to be taxed for this one cost.

### 3. *Costs of exhibits*

Petitioner argues that costs associated with photocopying trial exhibits are not recoverable.

Section 1033.5, subdivision (a)(13), allows a party to recover costs for "[m]odels, the enlargement of exhibits and photocopies of exhibits, and the electronic presentation of exhibits, including costs of rental equipment and electronic formatting, may be allowed if they were reasonably helpful to aid the trier of fact." (See, e.g., *El Dorado Meat Co. v. Yosemite Meat and Locker Service, Inc.*, *supra*, 150 Cal.App.4th at pp. 618–619.)

Here, as set forth in the City's memorandum of costs, the City sought costs for copying the record to provide the trial court with the evidence it needed for trial. (*Benach v. County of Los Angeles*, *supra*, 149 Cal.App.4th at p. 856 ["[a]lthough the [prevailing party] did not use the majority of its exhibits at trial, nothing indicates it could have anticipated that they would not be used. An experienced trial judge would recognize that it would be

24

inequitable to deny as allowable costs exhibits any prudent counsel would prepare in advance of trial"].)  The trial court did not abuse its discretion in awarding them.

4. *Record preparation costs*

As the prevailing party in a CEQA proceeding, the City was entitled to costs.  (Code Civ. Proc., § 1032, subd. (b).)  Those costs include "the amounts . . . reasonably and necessarily incurred in preparing the" record of proceedings.  (*Wagner Farms, Inc. v. Modesto Irrigation Dist.* (2006) 145 Cal.App.4th 765, 774; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 181 ["Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court"].)

Urging us to reverse, petitioner argues that the City either agreed to pay costs or forgo future costs.  While the record is not entirely clear, the trial court did not err in concluding that the City specifically reserved its right to seek costs.  As noted above, respondents' counsel specifically stated that they were "still going to make a motion for those costs.  We're entitled to under the law."  This statement supports the trial court's determination that the City did not unequivocally agree to either waive all costs or forgo all future costs.

For the first time on appeal, petitioner argues that the City is estopped from claiming costs it agreed to forgo.  Aside from the fact that we are not convinced by petitioner's characterization of counsel's comments at the August 7, 2019, hearing, this argument has been forfeited.  It is well-settled that arguments not raised in the trial court may not be raised on appeal. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 699.)

25

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

26